**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRANSGENDER LAW CENTER and RAPID DEFENSE NETWORK**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES IMMIGRATION & CUSTOMS ENFORCEMENT**<br><br>**Defendant.** | **Case No. 21-cv-2153 (RCL)**<br>**Case No. 21-cv-2155 (RCL)**<br>**(Consolidated)** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..................... ii

PRELIMINARY STATEMENT ..................... 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................... 3

ARGUMENT ..................... 8

I. STANDARD OF REVIEW ..................... 8

II. ICE FAILED TO PERFORM AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS ..................... 10

III. ICE HAS NOT DESCRIBED ITS REDACTIONS AND WITHHOLDINGS WITH THE REQUISITE SPECIFICITY ..................... 12

IV. ICE HAS NOT SHOWN FORESEEABLE HARM ..................... 14

V. ICE FAILED TO SHOW IT RELEASED ALL REASONABLY SEGREGABLE INFORMATION ..................... 18

VI. ICE HAS NOT MET ITS BURDEN TO SHOW THAT EXEMPTION 7 APPLIES ..................... 20

VII. ICE HAS NOT JUSTIFIED ITS WITHHOLDINGS UNDER PRIVACY EXEMPTIONS 6 AND 7(C) ..................... 21

VIII. ICE IS IMPROPERLY WITHHOLDING MATERIALS UNDER EXEMPTION 5 ..................... 25

A. ICE Has Not Justified Its Withholdings Under the Deliberative Process Privilege ..................... 25

B. ICE's Descriptions of Attorney-Client Privilege Do Not Match the Documents ..................... 27

IX. ICE CANNOT WITHHOLD RECORDS UNDER EXEMPTION 7(E) ..................... 29

CONCLUSION ..................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*100Reporters LLC v. DOJ*,
248 F. Supp. 3d 115 (D.D.C. 2017) .....20, 22

*ACLU v. DOJ*,
655 F.3d 1 (D.C. Cir. 2011) .....21, 22

**American Immigration Council v. DHS*,
950 F. Supp. 2d 221 (D.D.C. 2013) .....20, 26, 28, 30

*American Oversight v. DHS*,
691 F. Supp. 3d 109 (D.D.C. 2023) .....12, 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .....8

*Avendano-Hernandez v. Lynch*,
800 F.3d 1072 (9th Cir. 2015) .....3

*Bagwell v. DOJ*,
311 F. Supp. 3d 223 (D.D.C. 2018) .....12

**Bartko v. DOJ*,
898 F.3d 51 (D.C. Cir. 2018) .....8, 20

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980) .....26

*Center For Investigative Reporting v. U.S. Customs & Border Protection*,
436 F. Supp. 3d 90 (D.D.C. 2019) .....15

*DOJ v. Reporters Committee for Freedom of the Press*,
489 U.S. 749 (1989) .....22

*EPIC v. DHS*,
926 F. Supp. 2d 311 (D.D.C. 2013) .....19

*Evans v. Federal Bureau of Prisons*,
951 F.3d 578 (D.C. Cir. 2020) .....29

*Founding Church of Scientology v. NSA*,
610 F.2d 824 (D.C. Cir. 1979) .....10, 11

*Hertzberg v. Veneman*,
273 F. Supp. 2d 67 (D.D.C. 2003) .....18

*Humane Society of U.S. v. Animal & Plant Health Inspection Service*,
386 F. Supp. 3d 34 (D.D.C. 2019) ....................24

*Judicial Watch, Inc. v. Department of Commerce*,
375 F. Supp. 3d 93 (D.D.C. 2019) ....................15

*Larson v. Department of State*,
565 F.3d 857 (D.C. Cir. 2009) ....................8

**Lawyers' Committee for Civil Rights Under Law v. DOJ*,
No. 18-cv-167, 2020 U.S. Dist. LEXIS 246100 (D.D.C. Oct. 16, 2020) ....................17, 23, 24, 26

**Leopold v. DOJ*,
94 F.4th 33 (D.C. Cir. 2024) ....................8, 15, 18

*Long v. ICE*,
279 F. Supp. 3d 226 (D.D.C. 2017) ....................10

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009) ....................29

**Mead Data Central, Inc. v. Department of the Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ....................12, 14, 19

*Nat'l Sec. Counselors v. CIA*,
960 F. Supp. 2d 101 (D.D.C. 2013) ....................26

*New Orleans Workers' Center for Racial Justice v. ICE*,
373 F. Supp. 3d 16 (D.D.C. 2019) ....................20

*Oglesby v. Department of Army*,
920 F.2d 57 (D.C. Cir. 1990) ....................10

*Pinson v. DOJ*,
236 F. Supp. 3d 338 (D.D.C. 2017) ....................14

*Public Employees for Environmental Responsibility v. EPA*,
211 F. Supp. 3d 227 (D.D.C. 2016) ....................28

**Reporters Committee for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ....................15, 16, 17

*Russell v. Department of Air Force*,
682 F.2d 1045 (D.C. Cir. 1982) ....................27

*SafeCard Servs. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ....................10

*Schlefer v. United States*,
702 F.2d 233 (D.C. Cir. 1983)....................28

*Sciacca v. FBI*,
23 F. Supp. 3d 17 (D.D.C. 2014)....................12, 13

*Stern v. FBI*,
737 F.2d 84 (D.C. Cir. 1984)....................23

*Strunk v. Department of State*,
845 F. Supp. 2d 38 (D.D.C. 2012)....................31

*Summers v. DOJ*,
140 F.3d 1077 (D.C. Cir. 1998)....................8

*Techserve All. v. Napolitano*,
803 F. Supp. 2d 16 (D.D.C. 2011)....................27

*Transgender Law Center v. ICE*,
46 F.4th 771 (9th Cir. 2022)....................3, 22, 23

*Trea Senior Citizens League v. Department of State*,
923 F. Supp. 2d 55 (D.D.C. 2013)....................26

*Valencia-Lucena v. U.S. Coast Guard*,
180 F.3d 321 (D.C. Cir. 1999)....................10, 11

**Vaughn v. Rosen*,
484 F.2d 820 (D.C. Cir. 1973)....................13

*Watkins Law & Advocacy, PLLC v. United States*,
78 F.4th 436 (D.C. Cir. 2023)....................19

*Wilderness Society v. Department of the Interior*,
344 F. Supp. 2d 1 (D.D.C. 2004)....................19, 27

*Wolfe v. Department of Health & Human Services*,
839 F.2d 768 (D.C. Cir. 1988)....................27

*WP Co. LLC v. DOD*,
626 F. Supp. 3d 69 (D.D.C. 2022)....................25

**Statutes**

5 U.S.C. § 552....................15, 18, 21, 25, 29

8 U.S.C. §1225....................6

8 U.S.C. §1231....................6

Immigration and Nationality Act Section 236(c)....................................................................6

**Other Authorities**

6 C.F.R. § 115.41 ..........................................................................................................................6

## PRELIMINARY STATEMENT

Through the Freedom of Information Act requests at issue in this case, Plaintiffs Transgender Law Center ("TLC") and Rapid Defense Network ("RDN") aim to gather and provide to the public records providing the most comprehensive picture of how our government treats some of the most vulnerable people in its custody: transgender people held in civil immigration detention by Defendant Immigration and Customs Enforcement ("ICE"). Despite a 2015 directive from ICE headquarters meant to improve their treatment, transgender detainees continue to experience sexual and physical violence, verbal abuse, poor medical care and prolonged solitary confinement. *See generally* Decl. of Lynly S. Egyes ("Egyes Decl.").

In 2021, TLC and RDN made six FOIA requests to ICE, seeking a range of policy documents, communications, memoranda and reports containing information regarding the agency's plans and policies involving transgender detainees – and details about how transgender detainees actually were treated. To date, ICE has produced more than 7,600 pages of documents, dozens of Excel spreadsheets, and one video in response to those requests. While those records help provide the clearest picture to date of ICE's often appalling mistreatment of transgender detainees, large portions of the public records have been redacted or withheld entirely. ICE's Motion for Summary Judgement and its accompanying filings (Dkts. 40 — 40-3) fail to meet the agency's burdens under FOIA for eight principal reasons.

**First**, ICE's descriptions of its searches for responsive records reveal obvious deficiencies, including the failure to search the email archives of two ICE officials specifically named in Plaintiffs' requests and use of facially inadequate search terms.

**Second**, ICE's explanations of its withholdings are deficient across the board because they do not provide the specifics that the law requires.

**Third**, the agency's perfunctory descriptions of its analyses of foreseeable harm fall well short of the requirements of the FOIA Improvement Act and the D.C. Circuit's explanations of its mandates.

**Fourth**, the conclusory statements ICE presents to show it produced all reasonably segregable, non-exempt materials are inadequate to meet its burden as a matter of law.

**Fifth**, ICE failed to properly justify its invocation of the law-enforcement Exemption 7, and as a result the agency cannot claim that exemption's subsections to support its withholdings.

**Sixth**, in its descriptions of withholdings under privacy Exemptions 6 and 7(C), ICE failed to provide the detailed justifications tied to specific documents that the law requires.

**Seventh**, ICE did not meet its burden to show that it properly withheld privileged materials pursuant to Exemption 5. Its invocation of the deliberative process privilege fails because it does not provide the detail necessary to determine whether the withheld records truly are predecisional and deliberative, nor does ICE show that it released all non-exempt factual material. Regarding the attorney-client privilege, ICE has not provided sufficient information to show that the privilege applies – and asserted the privilege for several documents that do not contain any such redactions.

**Eighth**, ICE's vague justifications for its withholdings under Exemption 7(E) are insufficient to show the information redacted involved law enforcement techniques and procedures whose release would lead to circumvention of the law.

For the reasons set forth below, this Court should deny ICE's motion for summary judgment, grant Plaintiffs' cross-motion, and enter an order requiring ICE to perform a proper search and release the records and information it is improperly withholding.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2015, ICE "acknowledged the vulnerabilities of transgender persons" by "issu[ing] detailed guidance to its officers and employees regarding steps to assure the safety and proper care of transgender individuals held in immigration detention." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1081 n.4 (9th Cir. 2015). Known as the "Transgender Care Memorandum," this policy document sets forth nonbinding recommendations purportedly designed to help ICE "provide a respectful, safe and secure environment for all detainees, including those individuals who identify as transgender." *See* Decl. of Matthew E. Kelley ("Kelley Decl.") Ex. 1 (copy of Transgender Care Memorandum produced at Bates Nos. 132-49).

Since then, transgender detainees have continued to experience abuse, neglect, discrimination, violence and death. *See, e.g.*, Egyes Decl. ¶¶ 10-36 & Exs. A-C; Emily Torstveit Ngara, *Immigration Detention as a Violation of Transgender Detainees' Substantive Due Process Rights*, 26 Lewis & Clark L. Rev. 749, 754-63 (2022) (collecting reports of transgender detainees being subjected to physical and sexual abuse, harassment, poor medical care, and solitary confinement). Roxsana Hernandez, a transgender asylum-seeker from Honduras, died in ICE custody in 2018 after ICE officials denied her the urgent medical care her doctors recommended. *Transgender Law Ctr. v. ICE*, 46 F.4th 771, 777-78 (9th Cir. 2022); Egyes Decl. ¶ 14. Another transgender asylum-seeker, Johana Medina León, died in 2019 after ICE ignored her medical problems until she was on the edge of death, then released her to a hospital due to worries about a "poor outcome." *Id.* ¶ 18; *see also* Andrea Castillo & Jie Jenny Zou, *ICE rushed to release a sick woman, avoiding responsibility for her death. She isn't alone*, L.A. Times (May 13, 2022), https://www.latimes.com/world-nation/story/2022-05-13/ice-immigration-detention-deaths-sick-detainees.

On April 19, 2021, TLC and RDN filed the six FOIA requests at issue in this litigation: four originally in issue in case No. 21-cv-02153 and two in case No. 21-cv-02155. The requests seek public records that serve the public interest by allowing transgender people to present proof from ICE's own files supporting their experiences in immigration detention and to advocate for their rights and prevent further deaths and prolonged confinement under unacceptable conditions. Egyes Decl. ¶ 37. Those requests are as follows:

Request A, No. 21-cv-02153:

- Any policies, procedures, guidelines, instructions, quotas or other materials concerning detention of a transgender or intersex person in existence on or after January 1, 2015;
- Any policies, procedures, guidelines, instructions, quotas or other materials concerning detention of a transgender or intersex person during the COVID-19 pandemic from January 1, 2020 to the present; and
- Any training manuals, guides, memoranda, and other documents used to train ICE employees, DHS employees, or third-party contractors in the administration, regulation, or provision of medical and mental health care of transgender or intersex people in detention in existence on or after January 1, 2015.

Compl. ¶ 11 & Ex. 1, No. 21-cv-02153.

Request B, No. 21-cv-02153:

- Any records regarding detention facilities' oversight and management of and responses to grievances or complaints by transgender and/or intersex people;
- Any policies, procedures, guidelines, instructions, quotas or other materials concerning detention facilities' oversight and management of and responses to grievances or complaints by transgender and/or intersex people;
- Any training manuals, guides, memoranda, and other documents used to train ICE officers, DHS employees, or third-party contractors in the administration, and regulation concerning ICE related facility oversight data and management of any grievances or complaints by transgender and/or intersex people;
- Records regarding the number of grievances or complaints filed by transgender and/or intersex detainees regarding medical treatment or access; and
- Records regarding the number of grievances or complaints filed by transgender

and/or intersex detainees regarding detention facility staff.

Compl. ¶ 16 & Ex. 3, No. 21-cv-02153.

Request C, No. 21-cv-02153:

- Copies of each weekly transgender care update, from January 1, 2015 to the present. This is a record reflecting information that may include, but is not limited to, the number of transgender and/or intersex people in custody; the number in solitary confinement, protective custody, administrative segregation, or medical isolation; their detention facility location; any medical problems or mental health needs;

- Records showing the number of transgender and/or intersex people in ICE custody by year from January 1, 2015 to the present; and

- Records, including meeting agendas and memoranda, relating to or created in connection with quarterly working group meetings as required by Section 7(b) of the June 19, 2015 memorandum, "Further Guidance Regarding the Care of Transgender Detainees," which is available at https://www.ice.gov/sites/default/files/documents/Document/2015/TransgenderCareMemorandum.pdf.

Compl. ¶ 19 & Ex. 5, No. 21-cv-02153.

Request D, No. 21-cv-02153:

- All correspondence, including emails, letters and internal memoranda, containing the terms "transgender" and/or "intersex" for which Lana Khoury of DHS/ICE/ERO/Custody Programs was an author or recipient from January 1, 2015 to the present;

- All correspondence, including emails, letters and internal memoranda, containing the terms "transgender" and/or "intersex" for which Andrew R. Lorenzen-Strait of DHS/ICE/ERO/Custody Programs was an author or recipient from January 1, 2015 to the present; and

- All correspondence, including emails, letters and internal memoranda, containing the terms "transgender" and/or "intersex" for which Capt. Edith Lederman, M.D., M.P.H. of the ICE Health Service Corps was an author or recipient from January 1, 2015 to the present.

Compl. ¶ 22 & Ex. 7, No. 21-cv-02153.

Request A, No. 21-cv-02155:

- Any records related to any discretionary decisions by ICE from January 1, 2015 to

the present to detain a transgender or intersex person who has physical and mental health needs and who were found to be subject to mandatory detention pursuant to 8 U.S.C. §1226(c); Immigration and Nationality Act ("INA") Section 236(c);

- Any records related to any discretionary decisions by ICE from January 1, 2015 to the present to detain a transgender or intersex person who has physical and mental health needs and who were found to be subject to mandatory detention pursuant to 8 U.S.C. §1225(b); INA §235(b);

- Any records related to any discretionary decisions by ICE from January 1, 2015 to the present to detain a transgender or intersex person who has physical and mental health needs and who were found to be subject to mandatory detention pursuant to 8 U.S.C. §1231;

- Any records related to the evaluation of an initial and continued decision to detain a transgender or intersex person from January 1, 2015 to the present;

- Any records related to any Field Office Director exercising prosecutorial discretion against keeping a transgender or intersex detainee in detention from January 1, 2015 to the present;

- Any records related to any Field Office Director exercising prosecutorial discretion in favor of keeping a transgender or intersex detainee in detention from January 1, 2015 to the present;

- All records from January 1, 2015 to the present related to assessments and housing placements of each transgender and/or intersex detainee as required pursuant to 6 C.F.R. § 115.41; and

- Any policies, procedures, guidelines, instructions, quotas or other materials concerning discretionary decisions to detain or not detain a transgender or intersex person from January 1, 2015 to the present.

Compl. ¶ 11 & Ex. 1, No. 21-cv-02155.

Request B., No. 21-cv-02155:

- Any records created on or after January 1, 2015 related to the transfer of transgender or intersex detainees by ICE including, but not limited, to any policies, procedures, guidelines, instructions, quotas or other materials concerning transfer of transgender or intersex persons;

- Any records created on or after January 1, 2020 related to the transfer of transgender or intersex people by ICE during the COVID-19 pandemic including, but not limited, to any policies, procedures, guidelines, instructions, quotas or other materials concerning transfer of transgender or intersex people during the COVID-19 pandemic;

- Any policies, procedures, guidelines, instructions, quotas or other materials concerning detention of a transgender or intersex person during the COVID-19 pandemic for the period commencing on January 1, 2020 and continuing through the COVID-19 pandemic; and

- Any records related to the transfer of transgender or intersex people by ICE during the COVID-19 pandemic including, but not limited, to any policies, procedures, guidelines, instructions, quotas or other materials concerning transfer of transgender or intersex people during the COVID-19 pandemic.

Compl. ¶ 16 & Ex. 3, No. 21-cv-02155.

Despite a follow-up email from counsel for RDN, ICE failed to respond to these requests by the May 19, 2021 statutory deadline. *See, e.g.*, Compl. ¶¶ 13-14 & Ex. B, 21-cv-02153. After waiting nearly three months without any communication from ICE, Plaintiffs on August 12, 2021 filed the two lawsuits that this Court consolidated in its unopposed order of August 23, 2021 (Dkt. 10).

ICE began processing the TLC and RDN requests only after Plaintiffs filed suit. Decl. of Fernando Pineiro ("Pineiro Decl.") ¶ 7 (Dkt. 40-2). ICE completed its searches for responsive records in early 2022 and made its first production on March 11, 2022. *See* 4/8/22 Joint Status Rept. (Dkt. 19). ICE finished its disclosures in July 2024. *See* 7/8/24 Joint Status Rept. (Dkt. 35); Notice of Compliance (Dkt. 39).

Pursuant to this Court's scheduling order (Dkt. 38), ICE filed its motion to dismiss regarding all records other than the video on August 12, 2024 (Dkt. 40). ICE asserts that it performed a reasonable search for responsive records and properly withheld records and portions thereof pursuant to FOIA Exemptions 5, 6 and 7(C), and 7(E). ICE Mem. at 3-25. The agency also asserts that it released all reasonably segregable, non-exempt information in the responsive records. *Id.* at 25-26.

TLC and RDN now oppose ICE's motion for summary judgment and cross-move for summary judgment on the grounds that ICE failed to perform a reasonable search for responsive records, improperly withheld records, and insufficiently justified its withholdings.

## ARGUMENT

### I. STANDARD OF REVIEW

A party is entitled to summary judgment when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. *E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In a FOIA case such as this one, a court must review the record *de novo* to "ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure under the FOIA." *Summers v. DOJ*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). The government may prevail on summary judgment only if its memoranda and declarations "describe the justifications for nondisclosure with *reasonably specific* detail, demonstrate that the information withheld *logically* falls within the claimed exemption, and are *not controverted* by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (emphases added).

FOIA's "provisions are generally to be construed liberally," and its exemptions "are to be construed narrowly" because the statute "provides a way for persons to obtain information about the conduct of their government." *Leopold v. DOJ*, 94 F.4th 33, 36-37 (D.C. Cir. 2024). The government, therefore, "bears the burden of proving that an exemption applies." *Bartko v. DOJ*, 898 F.3d 51, 62 (D.C. Cir. 2018). Under the 2016 amendments to FOIA, the government also "bears the burden of showing that it 'reasonably foresees that disclosure would harm an interest protected by an exemption' or that 'disclosure is prohibited by law.'" *Leopold*, 94 F.4th

at 37 (citations omitted).

This Court should deny ICE's motion for summary judgment and grant TLC's and RDN's cross-motion because ICE has failed to meet any of its burdens. ICE's declaration shows that its search for responsive records was inadequate because the agency failed to search obvious repositories such as the email accounts of two officials named in the requests, and some of its searches used obviously insufficient search terms. ICE failed to meet its burden to justify any of its withholdings because its explanations for those withholdings are too vague and nonspecific to meet FOIA's well-settled and specific requirements. ICE's withholdings suffer from two additional fatal problems: The agency has failed to show that releasing any of the withheld information would foreseeably harm an interest protected by the claimed exemptions, and its vague and conclusory statements are insufficient as a matter of law to show that it released all reasonably segregable, non-exempt material.

Further, ICE has not met its burden to show that all of its records were compiled for law enforcement purposes, and thus it cannot apply Exemption 7. ICE cannot withhold records under the privacy Exemptions 6 and 7(C) because it has not performed the proper balancing of privacy concerns against the strong public interest in these records. ICE cannot withhold records under Exemption 5 because it has not explained how the deliberative process privilege would apply to the withheld records or shown that it did not inappropriately withhold factual material, and it cannot show that the attorney-client privilege applies to those records that actually have redactions claimed for that purpose. ICE cannot withhold records pursuant to Exemption 7(E) because it has not shown that the withheld material would allow for circumvention of the law.

## II. ICE FAILED TO PERFORM AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS

ICE's description of its searches for responsive records demonstrate that those searchers were inadequate. For an agency to obtain summary judgment on the adequacy of its search, it "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). That includes filing "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* In other words, the government must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation omitted).

Importantly, "plaintiffs can rebut an agency's declarations and affidavits by demonstrating that there remains a genuine issue as to whether the agency performed an adequate search for documents responsive to the plaintiff's request." *Long v. ICE*, 279 F. Supp. 3d 226, 233 (D.D.C. 2017). That is, although courts may "rely[] upon agency affidavits," "the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979). Although "purely speculative claims about the existence and discoverability of other documents" do not overcome the presumption of good faith of agency affidavits, *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), those declarations must be sufficient under the law because "if, in the face of well-defined requests and positive indications of overlooked materials, an agency can

so easily avoid adversary scrutiny of its search techniques, the Act will inevitably become nugatory," *Founding Church*, 610 F.2d at 837.

One way FOIA plaintiffs can demonstrate that a search was inadequate is by identifying "a likely place where the requested documents might be located." *Valencia-Lucena*, 180 F.3d at 327 ("It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden."). ICE searched the emails of former official Andrew Lorenzen-Strait pursuant to Plaintiffs' specific requests for emails, letters and internal memoranda to or from him using the terms "transgender" or "intersex." Pineiro Decl. 25(d). But ICE does not state that it searched *any* files belonging to the other two ICE officials specifically named in the requests: Lana Khoury and Capt. Edith Lederman, M.D. *See* Compl. ¶ 22 & Ex. 7, No. 21-cv-02153. Obviously, the files of officials named in Plaintiff's requests are likely to contain the requested records. ICE's apparent failure to search those files is a glaring and fatal deficiency in its search.

Further, ICE used a wide variety of search terms in its queries of various digital repositories, showing that (a) it is possible for ICE to search using a comprehensive list of specific search terms, and (b) that the use of a smaller subset of vague terms is insufficient. For example, ICE searched its Health Service Corps SharePoint using the terms "transgender training," "transgender policy," "transgender clinical," "guideline," and "transgender directive." Pineiro Decl. ¶ 25(b). ICE searched its eClinicalWorks database that documents healthcare provided to detainees with the terms "transgender report," "transgender grievance," "grievances," and "patient medical records," as well as "various diagnosis codes" and the "transgender check box." *Id.* ICE searched its Office of Detention and Oversight Modernization System using the terms "detainee questionnaire," "detainee comments," and "transgender." *Id.*

¶ 20. None of these searches used "intersex" as a term, nor did all but one of them use "transgender" as a standalone term.

By contrast, ICE searched digital files for Enforcement and Removal Operation custody Management using "specific case numbers relating to transgender and/or intersex detainees," as well as 30 search terms including "transgender," "intersex," "trans g*," "trans w*," "trans m*," "trans p*," "trans sex*," "transg*," "transw*," "transm*," "transp*," and "transsex*." *Id.* ICE's failure to use this extensive list of search terms in any other search shows that those other searches were inadequate. *See Am. Oversight v. DHS*, 691 F. Supp. 3d 109, 115 (D.D.C. 2023) (ICE search was inadequate because it did not use variations or shortened versions of names); *Bagwell v. DOJ*, 311 F. Supp. 3d 223, 230 (D.D.C. 2018) (agency's failure to use likely abbreviations or acronyms as search terms rendered search inadequate).

ICE's searches were inadequate because it failed to search obvious repositories of responsive records and did not consistently use search terms reasonably calculated to locate responsive records. This Court therefore should order ICE to perform searches that fully comply with FOIA's requirements and disclose the additional responsive records those searches locate.

## III. ICE HAS NOT DESCRIBED ITS REDACTIONS AND WITHHOLDINGS WITH THE REQUISITE SPECIFICITY

Courts in the D.C. Circuit have long recognized that "because of the information asymmetries inherent in the FOIA system, the agency bears the burden of justifying any withholding of otherwise responsive information." *Sciacca v. FBI*, 23 F. Supp. 3d 17, 30 (D.D.C. 2014). To satisfy that burden on summary judgment, the agency withholding records "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566

F.2d 242, 250-51 (D.C. Cir. 1977); *see also, e.g.*, *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973). ICE has not come close to meeting that standard.

In this case, ICE chose not to submit a typical *Vaughn* index, opting instead to rely on the declaration of ICE FOIA Officer Fernando Pineiro. ICE Mem. at 11. That declaration is insufficient to enable Plaintiffs and the Court to evaluate ICE's claims that it is properly withholding large swaths of responsive information. For example, in describing the redactions and withholdings purportedly justified by privacy-related Exemptions 6 and 7(C), Pineiro does not tie *any* purported basis for withholding to *any* specific page or document. *See id.* ¶¶ 36-45. Plaintiffs and the Court are left to guess at which of the thousands of redactions among more than 7,600 pages of records conceal which specific kinds of purportedly private information about which types of government officials and third parties. Agency declarations such as this that fail "even to list or describe the responsive documents at issue" are "manifestly insufficient as a matter of law to allow the Court to assess the applicability of the FOIA exemptions [they] discuss[]." *Sciacca*, 23 F. Supp. 3d at 30.

Although the Pineiro Declaration provides Bates numbers of some of the records withheld and redacted under claims of Exemptions 5 and 7(E), it still lacks the specificity that the law requires. For example, the declaration says 41 scattered pages in ICE's productions were withheld under the deliberative process privilege because they fit under the broad category of "emails between the Enforcement and Removal Operation and ICE Health Service Corps employees discussing recommendations to improving training slides and policy documents relating to transgender and LGBT detainees, including recommended edits, thoughts, concerns and suggestions on the updates to and creation of these records." Pineiro Decl. ¶ 29. The declaration lists similarly vague and broad descriptions as justifying withholding a set of 39

pages and two sets of 23 pages each. *Id.* These are not the specific and detailed descriptions that the law requires.

Similarly, the declaration states that ICE "withheld internal law enforcement URLs" from 180 pages of otherwise unspecified "emails and patient summaries" under Exemption 7(E). *Id.* ¶ 48. The declaration states that "on various immigration forms, emails, and law enforcement system printouts, ICE withheld internal enforcement codes, what record checks are performed for detainees, and screen shots demonstrating how to navigate law enforcement systems" under Exemption 7(E) on an undifferentiated list of 56 pages of records. *Id.* On their face, each of these descriptions is the opposite of "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead*, 566 F.2d at 250-51.

This Court should deny summary judgment to ICE on all of its redactions and withholdings because of this fundamental flaw in its declaration. Because ICE has utterly failed to meet its burden to specifically identify the justifications for its redactions and withholdings, this Court should grant summary judgment for TLC and RDN and order ICE to release the withheld records.

## IV. ICE HAS NOT SHOWN FORESEEABLE HARM

Another fatal flaw cutting across all of ICE's attempts to justify its withholdings is its failure to meet its burden to show foreseeable harm. Eight years ago, Congress passed the FOIA Improvement Act, which places an additional burden on agencies when withholding information subject to discretionary exemptions. *See Pinson v. DOJ*, 236 F. Supp. 3d 338, 359 (D.D.C. 2017). The Act provides that an agency may only withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (II)

disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "Agencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information." *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (internal marks omitted). Rather, the "foreseeable harm" requirement "imposes an independent and meaningful burden on agencies" to "concretely explain how disclosure 'would' – not 'could' – adversely impair" an interest the exemption protects. *Id.* at 369-70 (internal marks omitted); *see also Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019) ("[A]n agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest[.]").

To carry their burden under this "foreseeable harm" requirement, agencies must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials and connect the harms in a meaningful way to the information withheld." *Ctr. For Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (internal marks omitted). The law requires agencies to "provide 'a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede' the interests protected by a FOIA exemption." *Leopold*, 94 F.4th at 37 (citation omitted). Neither "boilerplate and generic assertions" nor "wholly generalized and conclusory" statements will do. *Id.* (citation omitted).

ICE's attempts to meet the foreseeable harm standard here consist entirely of the boilerplate and generic assertions that courts have repeatedly rejected – in some cases, nearly word-for-word. In *Reporters Committee*, the D.C. Circuit held that the following language in an FBI declaration was insufficient to meet the foreseeable harm requirement:

> Disclosure of [material containing or prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations] would have an inhibiting effect upon agency decisionmaking and the development of policy because it would chill full and frank discussions between agency personnel and decision makers regarding a decision. If agency personnel know that their preliminary impressions, opinions, evaluations, or comments would be released to the general public, they would be less candid and more circumspect in expressing their thoughts, which would impede the fulsome discussion of issues necessary to reach a well-reasoned decision.

3 F.4th at 370. The D.C. Circuit also found inadequate the Justice Department Office of Inspector General's "sweeping assertion" that

> requir[ing] disclosure of the withheld information would prevent the [agency] from engaging in meaningful documented discussion about policy matters in the future, which could have a negative effect on agency decision-making, and would potentially confuse the public about the reasons for the [agency's] actions in this matter.

*Id.* at 371 (calling this language "*precisely* the kind of boilerplate, unparticularized, and hypothesized assertion of harm that . . . would be insufficient") (emphasis in original).

ICE's description of its foreseeable harm analysis is no different. Regarding records withheld under a claim of the deliberative process privilege, for example, ICE's declarant states that releasing those records

> would cause foreseeable harm by discourage[ing] the expression of candid opinions, and inhibit the free and frank exchange of information among agency personnel. This harm would result in a chilling effect on intra- and inter-agency communications.

Pineiro Decl. ¶ 29. As in *Reporters Committee*, ICE's declaration here is merely "mouthing the generic rationale for the deliberative process privilege itself." 3 F.4th at 370.

ICE's foreseeable harm rationale for its withholding of "draft" documents is even worse. ICE's declarant states that releasing "drafts"

> *could* cause foreseeable harm by misleading the public as the comments and text of draft documents often differ, sometimes significantly, from final agency positions. Disclosure of such material *could* also cause the same chilling effect noted in paragraph 29.

Pineiro Decl. ¶ 30 (emphases added). The D.C. Circuit has underscored that "[i]n the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would' – not 'could' – adversely impair internal deliberations." *Reporters Committee*, 3 F.4th at 369-70. Here, "ICE never tethers its concerns to these particular documents," and therefore "ICE's objections could apply to basically any withheld draft." *Am. Oversight*, 691 F. Supp. 3d at 117 (ordering ICE to release all documents withheld solely under Exemption 5 because of its failure to demonstrate foreseeable harm).

Similarly, ICE states that releasing the information withheld under Exemption 7(E) "would permit those seeking to violate or circumvent the law to take proactive steps to counter operational and investigative actions taken by the Enforcement and Removal Operation [sic], such as evading detection or accessing and disrupting data systems." Piniero Decl. ¶ 40. Again, this is merely "mouthing the generic rationale" for Exemption 7(E).

ICE's invocation of foreseeable harm for the information withheld pursuant to the privacy Exemptions 6 and 7(C) fares no better. The agency makes the conclusory assertion that this information "if disclosed to the public or to a third-party requester without the permission of the individual, would cause foreseeable harm to the individual, expose the individual to identity theft and may reasonably lead to unwanted contact from persons that might seek to harm the individual." ICE Mem. at 21.

But this Court is "not required merely to 'accept the agency's conclusory say-so.'" *Lawyers' Comm. for Civil Rights Under Law v. DOJ*, No. 18-cv-167 (EGS/GMH), 2020 U.S. Dist. LEXIS 246100, at *102 (D.D.C. Oct. 16, 2020) (cleaned up). Rather, "to justify the redactions of the names of employees because of feared harassment, there must be some competent evidence that disclosure of that information could lead to harassment." *Id.* ICE has

provided none.

ICE's vague and conclusory assertions of foreseeable harm are insufficient to meet its burden to meaningfully explain why the specific materials being withheld would cause specific harms to the interests that the exemptions protect. This Court therefore should deny ICE's motion for summary judgment, grant Plaintiffs' cross-motion, and order ICE to release the improperly withheld materials.

## V. ICE FAILED TO SHOW IT RELEASED ALL REASONABLY SEGREGABLE INFORMATION

ICE's motion for summary judgment should be denied for the independent reason that ICE failed to show that it released all non-exempt information that reasonably could be separated from information that genuinely falls within an exemption. FOIA requires that "[a]ny reasonably segregable portion" of the records be produced "after deletion of the portions which are exempt." 5 U.S.C. § 552(b). To withhold any requested document in its entirety, therefore, an agency "must demonstrate that it cannot segregate the exempt material from the non-exempt." *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003).

The D.C. Circuit recently explained that when Congress added the foreseeable harm provision to FOIA in 2016, it re-emphasized the requirement that non-exempt material must be segregated and produced. *Leopold*, 94 F.4th at 37 (noting that 5 U.S.C. § 552(a)(8)(A)(ii)(I)-(II) requires agencies to "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and to "take reasonable steps necessary to segregate and release nonexempt information"). The D.C. Circuit reiterated that "[e]ven if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." *Id.*

"[A] blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability." *Wilderness Soc'y v. Dep't of the Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004); *see also Mead*, 566 F.2d at 261 ("[I]f the Air Force decides to continue in its claim that the non-exempt material in these documents is not reasonably segregable . . . , it must provide a more detailed justification than the conclusory statements it has offered to date."). Instead, "[t]o justify withholding a document in full, an agency must show with reasonable specificity why the document cannot be further segregated, or why the document is not reasonably segregable – for example, because the nonexempt material would be an essentially meaningless set of words and phrases." *EPIC v. DHS*, 926 F. Supp. 2d 311, 315 (D.D.C. 2013) (cleaned up).

Here, ICE's declaration states only in the most general and conclusory terms that "[f]or each document, a page-by-page and line-by-line careful review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied." Pineiro Decl. ¶ 52. In other words, ICE merely states that none of the withheld information was segregable without offering any insight into *why* that is so. It is settled law that such unadorned assertions are not enough to meet the agency's burden.

ICE asserts that its declaration is entitled to a presumption of good faith, and argues that presumption is sufficient to carry its burden to show that it complied with its burden to disclose reasonably segregable material. ICE Mem. at 25. Not so. To the contrary, the D.C. Circuit has repeatedly instructed that an agency is entitled to the presumption *only* where its declaration is "'relatively detailed and non-conclusory.'" *Watkins Law & Advocacy, PLLC v. United States*, 78 F.4th 436, 450 (D.C. Cir. 2023) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). The Pineiro Declaration is neither.

Because ICE has failed to show that it has released all reasonably segregable, non-exempt information, it has failed to meet its burden to justify its withholdings and is not entitled to summary judgment. This Court should grant Plaintiffs' cross-motion and order ICE to release the materials it is improperly withholding.

## VI. ICE HAS NOT MET ITS BURDEN TO SHOW THAT EXEMPTION 7 APPLIES

Another threshold area where ICE fails is that it does not and cannot support its assertion that Exemption 7 – which allows withholding of certain records compiled for law enforcement purposes – applies. ICE asserts that because it is a law enforcement agency, all of its records are compiled for law enforcement purposes and thus subject to Exemption 7. *See* Pineiro Decl. ¶¶ 33-35. That simply is not the law. *See, e.g.*, *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 159 (D.D.C. 2017) ("To be sure, not every document compiled by a law enforcement agency is compiled for a law enforcement purpose."). Rather, an agency relying on any subsection of Exemption 7 must show "how and under what circumstances the requested files were compiled" as well as "whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding[.]" *Bartko*, 898 F.3d at 64.

ICE should know better than to make this specious argument. Courts here and across the country have repeatedly rejected identical assertions by ICE that because it is a law enforcement agency, all of its records are subject to Exemption 7. *See, e.g.*, *New Orleans Workers' Ctr. for Racial Justice v. ICE*, 373 F. Supp. 3d 16, 56-57 (D.D.C. 2019) (ICE's "broad and conclusory assertion" in a Pineiro Declaration that all responsive records were compiled for law enforcement purposes "falls far short of satisfying its burden" to show Exemption 7 applies); *Am. Immigration Council v. DHS*, 950 F. Supp. 2d 221, 245-46 (D.D.C. 2013) (rejecting ICE's blanket assertion of Exemption 7 and noting that "similar explanations prepared by ICE's FOIA

unit and submitted in other jurisdictions have been deemed insufficient to prove that the underlying records were 'compiled for law enforcement purposes'") (citing *Black v. DHS*, No. 10-2040, 2012 WL 3155142, at *3 (D. Nev. Aug. 2, 2012)). Absent the required showing, this Court should analyze ICE's privacy withholdings under the higher bar for withholding set by Exemption 6: that releasing the information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

## VII. ICE HAS NOT JUSTIFIED ITS WITHHOLDINGS UNDER PRIVACY EXEMPTIONS 6 AND 7(C)

Entirely apart from its other failures, ICE has failed to meet its burden to demonstrate that it properly withheld materials under privacy Exemptions 6 and 7(C).[1] Exemption 6 allows the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Similarly, exemption 7(C) permits an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). Where the government claims both exemptions, courts focus on Exemption 7(C) because it is more protective of personal privacy than Exemption 6 and therefore "establishes a lower bar for withholding material." *ACLU v. DOJ* ("*ACLU I*"), 655 F.3d 1, 6 (D.C. Cir. 2011). As explained in the previous section, however, in this case the Court should analyze the privacy redactions under Exemption 6 only.

FOIA's privacy exemptions "require agencies and reviewing courts to 'balance the privacy interests that would be compromised by disclosure against the public interest in the

[1] As the agency correctly notes, ICE Mem. at 2, Plaintiffs do not challenge ICE's redactions of names and other identifying information about detainees.

release of the requested information.'" *100Reporters*, 248 F. Supp. 3d at 158 (quoting *Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993)). On the public interest side of the balance, courts must consider the extent to which disclosure would advance "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny,'" thus furthering "the citizens' right to be informed about 'what their government is up to.'" *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citations omitted). The D.C. Circuit has stressed that "[a]t all times, courts must bear in mind that FOIA mandates a strong presumption in favor of disclosure, and that the statutory exemptions, which are exclusive, are to be narrowly construed." *ACLU I*, 655 F.3d at 5 (cleaned up).

Although ICE's justifications for its privacy withholdings are too non-specific to allow the Court and Plaintiffs to evaluate if individual redactions are proper, some of its categorical withholdings are clearly improper. For example, ICE contends that it is withholding domain names (*i.e.*, the portions of email addresses after the @ symbol) because disclosing them would expose ICE employees to the threats of cyber and physical attacks. Piniero Decl. ¶¶ 39, 41; ICE Mem. at 20-21. However, as the Ninth Circuit pointed out in another case in which ICE attempted to withhold domain names from TLC, "email domains are not specific to particular individuals—email domains are shared by all employees within a given DHS component—so they do not satisfy the threshold test, and thus cannot be withheld" under Exemptions 6 and 7(C). *Transgender Law Ctr.*, 46 F.4th at 784 (remanding to the District Court for entry of an order requiring ICE to release domain names).[2] Releasing domain names will allow TLC and RDN to better understand "which agencies and departments are involved in making different types of

[2] The court-ordered release of domain names to TLC in this Ninth Circuit case shows that ICE's contention that these domain names "are not publicized" is inaccurate. Piniero Decl. ¶ 41.

decisions" without identifying specific individuals. *Id.* (quoting *Bloche v. DOD*, 370 F. Supp. 3d 40, 59 (D.D.C. 2019)).

Further, ICE has not properly withheld any information under the privacy exemptions because it has not performed the requisite balancing test. ICE merely asserts, without analysis, that "disclosure of this personal information would not assist the public in understanding how ICE is carrying out its statutory responsibilities." ICE Mem. at 21. That is not the case. Here, the public has a strong interest in knowing more about who is responsible for the life-altering decisions on policy and practice regarding transgender detainees.

For example, the public interest in learning how ICE has performed its statutory duties favors releasing the identities of participants in policy deliberations because those identities "could shed light on whether the records were appropriately withheld pursuant to the deliberative process privilege" under Exemption 5. *Lawyers' Comm.*, 2020 U.S. Dist. LEXIS 246100, at *102. ICE's redactions of names prevent any independent evaluation of whether its redactions under the deliberative process privilege are proper.

ICE asserts that it has released the names of "senior and public-facing ICE employees, such as senior leaders who are identified on the ICE public-facing website or members of the Office of Public Affairs." ICE Mem. at 20. The D.C. Circuit has recognized that privacy interests diminish and the public's interest rises with the seniority and authority of the public employee in question. *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) (high-ranking officials have diminished privacy interests and public interest in the identity of an official rises with their "level of responsibility"). This distinction makes sense, because Americans cannot fully understand what their government is up to without knowing *who* within the government is calling the shots. But ICE does not explain what criteria it uses to determine who is and is not a

"senior leader," and without any clue as to what level of responsibility employees have, it is impossible to evaluate whether they are the line-level workers whose privacy interests may be strong enough to justify redacting their names.

ICE also does not differentiate the types of employees involved. Courts in this District have rejected arguments that all employees of agencies with law enforcement or national security functions have a substantial privacy interest in keeping their identities secret. *See Lawyers' Comm.*, 2020 U.S. Dist. LEXIS 246100, at **100-01 (collecting cases). "Rather, the agency must establish, at the very least, that the employees whose names have been withheld not only are employed in a sensitive agency, but also that they have sensitive occupations." *Id.* (cleaned up). ICE does not even attempt to make this showing.

ICE also asserts that it is withholding identifying information about "third parties." ICE Mem. at 20-21; Pineiro Decl. ¶¶ 39, 42, 44. Not all third parties have the same privacy interests, however. Civilians named in records regarding investigations of crimes have higher privacy interests than employees of detention centers under contract to ICE – and the public's interest in the latter's identities is far higher. *See, e.g.*, *Humane Soc'y of U.S. v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 43 (D.D.C. 2019) (FOIA's privacy exemptions "cannot be invoked 'to protect the concerns of a contractor who would be embarrassed by disclosure of his responsibility for shoddy work.'") (quoting *Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980)).

For example, ICE redacted from slides that accompanied a seminar regarding awareness and understanding of LGBT people in detention the names of the two university professors who made the presentation. *See* Kelley Decl. Ex. 2 at 1-2 (Bates Nos. 422-23). ICE also redacted the names of others involved in developing the presentation, including a law professor, a policy advisor for ICE's Custody Program, and the Compliance Unit Supervisor for the Otay Detention

Facility. *Id.* The public has a strong interest in learning who develops and presents training to ICE employees on this topic – and it defies credulity to contend that these professors would suffer an unwarranted invasion of privacy by being identified as presenting this seminar. Indeed, one of the authors, Valerie Jenness, lists the presentation on her publicly available curriculum vitae. *See* https://bpb-us-e2.wpmucdn.com/faculty.sites.uci.edu/dist/d/566/files/2024/03/Jenness-Valerie_CV_March_2024-d6902c2192db7e36.pdf. Also redacted are the names of the lead authors of a report on the National Transgender Discrimination Survey, which is publicly available online. Kelley Decl. Ex. 2 at 31 (Bates No. 452).

Because ICE cannot show that individuals' privacy interests outweigh the public interest in disclosure for each one of the thousands of Exemption 6 and 7(C) redactions of information regarding ICE employees and third parties, it has failed to meet its burden to show that those redactions are justified.

## VIII. ICE IS IMPROPERLY WITHHOLDING MATERIALS UNDER EXEMPTION 5

Exemption 5 allows the government to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 "effectively affirms the application of evidentiary privileges to FOIA actions – most notably the attorney-client and deliberative process privileges." *WP Co. LLC v. DOD*, 626 F. Supp. 3d 69, 84 (D.D.C. 2022). Here, ICE asserts it is withholding materials subject to both of those privileges. *See* ICE Mem. at 12-18. The agency has not supported its claim to either privilege, however.

### A. ICE Has Not Justified Its Withholdings Under the Deliberative Process Privilege

To properly invoke the deliberative process privilege, the defendant agency must

establish that the material at issue is "predecisional and deliberative," meaning that it was "generated before the adoption of an agency policy" and "reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). As Judge Boasberg observed more than a decade ago: "Over the years, courts in this Circuit have developed a substantial body of precedent to guide the government in formulating descriptions of its deliberative-process withholdings." *Am. Immigration Council*, 950 F. Supp. 2d at 239. In summary, "[a]t a minimum, the agency must provide three basic pieces of information in order for the deliberative-process privilege to apply: (1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient." *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013). "Without such specificity, 'a court cannot decide, one way or the other, a deliberative process privilege claim.'" *Lawyers' Comm.*, 2020 U.S. Dist. LEXIS 246100, at **86-87 (citation omitted).

ICE has provided *none* of that specific information in this case. For example, ICE does not provide *any* information about *any* of the authors or recipients of the withheld documents, let alone the details of their relative positions and roles in whatever deliberative process purportedly was involved. *See generally* ICE Mem. at 15-17; Pineiro Decl. ¶¶ 29-30. Information about those who drafted and received the documents is crucial because "a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Trea Senior Citizens League v. Dep't of State*, 923 F. Supp. 2d 55, 69 (D.D.C. 2013) (citation omitted). Nor does ICE explain the specific deliberative process involved or the function and significance of each document in that process. *See* Pineiro Decl. ¶¶ 29-30. Rather,

all ICE provides are vague and general descriptions, each of which is applied to as many as 448 different pages listed by Bates number. *Id.* ¶¶ 29-30.

ICE refers to many of the documents as "drafts" and offers the tautology that drafts "[b]y their very nature" are predecisional and deliberative. *Id.* ¶ 30. That is insufficient, because "simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." *Wilderness Soc'y*, 344 F. Supp. 2d at 14; *see also Techserve All. v. Napolitano*, 803 F. Supp. 2d 16, 27 (D.D.C. 2011) (government must prove that a "draft" document is predecisional and deliberative).

Further, "agency communications containing purely factual material are generally not protected by" the deliberative process privilege. *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982). Thus, "Exemption 5 disputes can often be resolved by the simple test that factual material must be disclosed but advice and recommendations may [in some circumstances] be withheld." *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988).

Here, ICE has made no apparent attempt to identify and release factual material within the documents it is withholding under the deliberative process privilege. It is clear that those documents contain quite a bit of purely factual matter. For example, ICE withheld entirely what it characterizes as drafts of slides accompanying a presentation to ICE employees on LGBT issues by two California professors. *See* Piniero Decl. ¶ 30. The less-redacted version of that slide deck shows that the presentation consists mostly of factual material – including a quote from Albert Einstein, several optical illusions, and news photographs of Caitlyn Jenner. Kelley Decl. Ex. 2 at 8, 10, 12-15, 27 (Bates Nos. 429, 431, 433-36, 448).

ICE has failed to provide the specifics necessary to evaluate its claim of the deliberative process privilege, and therefore has not met its burden to demonstrate that the privilege applies.

### B. ICE's Descriptions of Attorney-Client Privilege Do Not Match the Documents

In the FOIA context, the attorney-client privilege protects communications between agency counsel and agency employees, but only if "the communication from attorney to client is confidential" and "the communication is based on confidential information provided by the client." *Schlefer v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983). The attorney-client communications must be confidential and must have been kept confidential; communications involving "non-clients or 'strangers'" are not privileged. *Am. Immigration Council*, 950 F. Supp. 2d at 244. As with any privilege claimed under Exemption 5, the agency bears the burden of proving that the withheld materials actually fall within the scope of the attorney-client privilege. *Pub. Emps. for Envtl. Responsibility v. EPA*, 211 F. Supp. 3d 227, 231 (D.D.C. 2016) ("Of course, the attorney-client privilege is not an all-purpose FOIA evasion mechanism.").

ICE's descriptions of the redacted material it claims as attorney-client privileged are too vague to demonstrate that the privilege actually applies. ICE states in conclusory fashion that the communications were confidential and that "[t]he withheld information has been shared only with the client office employees." Pineiro Decl. ¶ 32, ICE Mem. at 12-13. But the agency does not offer any details, such as that they were labeled "restricted" or "confidential" or stored in ways that made them inaccessible to others. *See Pub. Emps.*, 211 F. Supp. 3d at 233 (agency had shown communications were kept confidential by submitting declaration stating that "OIG has tagged the relevant records with 'restricted' and 'official use only' labels, and has stored them in a database accessible only to authorized EPA-OIG employees."). To the contrary, emails purportedly redacted to protect the attorney-client privilege do not contain any markings indicating they were confidential or otherwise restricted or that they contain information provided to counsel in confidence. *See* Kelley Decl. Exs. 3 (Bates No. 2310); 4 (Bates No.

2376).

ICE's claims of attorney-client privilege also suffer from a more fundamental problem. Half of the pages listed as containing attorney-client privilege redactions – four out of eight – do not actually have any Exemption 5 redactions noted at all. *Compare* Pineiro Decl. ¶ 32 (listing redactions on pages with Bates Nos. 7146, 7186, 7242 and 7375), *with* Kelley Decl. Exs. 5 (Bates No. 7146); 6 (Bates No. 7186); 7 (Bates No. 7242); 8 (Bates No. 7375).

ICE has not provided sufficient information to meet its burden to justify any of its Exemption 5 redactions. Accordingly, this Court should deny ICE's motion for summary judgment regarding Exemption 5 and enter an order requiring the release of all materials withheld under that exemption.

## IX. ICE CANNOT WITHHOLD RECORDS UNDER EXEMPTION 7(E)

ICE also has not properly justified its withholdings claiming Exemption 7(E), which covers information in records compiled for law enforcement purposes that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). An agency claiming Exemption 7(E) must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (cleaned up). The agency thus must support its withholding with a sworn statement that shows with "reasonable specificity" that the exemption applies. *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 586 (D.C. Cir. 2020).

As discussed *supra* at 19-20, ICE has failed to make the required threshold showing that Exemption 7 applies, which precludes its Exemption 7(E) withholdings. ICE also failed to meet

its burden to "provide an itemized listing of their withholdings and redactions pursuant to 7(E), accompanied by a description of the circumstances in which the records were compiled, the relevant law-enforcement activity for each, the nature of the incident or individual involved, and the perceived security risk or likely violation of the law." *Am. Immigration Council*, 950 F. Supp. 2d at 246 (cleaned up). But even setting aside those fatal flaws, ICE has not met its burden to justify its 7(E) withholdings.

ICE's 7(E) withholdings appear to be limited to "techniques and/or procedures" rather than "guidelines." *See* Pineiro Decl. ¶¶ 47-48. To properly withhold such information, the agency must prove that they contain techniques or procedures "not generally known to the public" and that disclosure could create a reasonable risk of circumvention of the law. *Am. Immigration Council*, 950 F. Supp. 2d at 246. "Generic portrayals of categories of documents and vaguely formulated descriptions will not suffice; accordingly, the government must provide sufficient facts and context to allow the reviewing court to 'deduce something of the nature of the techniques in question.'" *Id.* (citation omitted). Here, as in *American Immigration Council*, ICE provides merely a "laundry list" of types of information withheld, often without any reference to specific page numbers. *Id.* at 247.

ICE does not elaborate on the reasons why these techniques and procedures are "not readily known by the public." Pineiro Decl. ¶ 50. Nor does it provide a logical explanation of how this information could lead to circumvention of the law. For example, ICE does not explain how information regarding "how various ICE and other law enforcement systems communicate with each other" or "law enforcement domain names" would allow "persons seeking improper access to law enforcement sensitive data to navigate these databases and compromise the integrity of the data either by deleting or altering information." *Id.* ¶¶ 48-48. That is not to say

no such logical connection exists; rather, if there is such a connection, ICE has not met its burden to explain it.

ICE's descriptions simply "offer too little detail to allow [Plaintiffs or the] Court to undertake a meaningful assessment of the redacted material." *Strunk v. Dep't of State*, 845 F. Supp. 2d 38, 47 (D.D.C. 2012). As such, ICE has not properly justified its 7(E) redactions.

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs Transgender Law Center and Rapid Defense Network respectfully request that this Court enter an order denying ICE's Motion for Summary Judgment, granting Plaintiffs' Cross-Motion for Summary Judgment, ordering ICE to release all improperly withheld documents in full, directing ICE to perform an adequate search for responsive records, and requiring ICE to release any additional responsive records located in that search.

Dated: August 19, 2024

Respectfully submitted,

BALLARD SPAHR LLP

By: s/ *Matthew E. Kelley*
Matthew E. Kelley, Bar # 1018126
1909 K Street, NW, 12 Floor
Washington, D.C. 20006
Phone: 202-508-1112
Email: kelleym@ballardspahr.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I caused the foregoing to be filed and served electronically via the Court's ECF system upon counsel of record.

Dated: August 19, 2024

*/s/Matthew E. Kelley*
Matthew E. Kelley