**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRANSGENDER LAW CENTER and RAPID DEFENSE NETWORK**, | |
| *Plaintiffs*, | |
| **v.** | **Case No. 1:21-cv-2153-RCL** |
| **UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT**, | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Transgender Law Center (TLC) and Rapid Defense Network (RDN) bring this Freedom of Information Act (FOIA) action against Defendant United States Immigration and Customs Enforcement (ICE), seeking disclosure of information regarding the treatment of transgender individuals in Department of Homeland Security (DHS) and ICE custody. After ICE failed to respond to Plaintiffs' FOIA requests, submitted on April 19, 2021, Plaintiffs filed two lawsuits that were consolidated into this action. Compl., ECF No. 1; Order Granting Mot. to Consolidate Cases, ECF No. 10. ICE has now completed its production of responsive records, and both parties have moved for summary judgment. ICE Mot. for Summ. J. ("ICE Mot."), ECF No. 40; Plaintiffs' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 41. Of note, ICE's final production was a video file, and given this delayed production, the parties briefed summary judgment regarding the video separately. *See* Scheduling Order, ECF No. 38 (ordering separate briefing of the video); Plaintiffs' Mot. for Summ. J. Regarding Video File ("Pls.' Video Mot."), ECF No. 45; ICE Mem. in Opp'n and Mot. for Summ. J. Regarding Video File ("ICE Video Mot."), ECF No. 46.

Plaintiffs allege that ICE's productions were deficient. Among other alleged deficiencies discussed herein, Plaintiffs claim that ICE conducted an inadequate search; wrongfully redacted certain email domain names pursuant to FOIA's exemption for private personal information; and unlawfully withheld the name of a narrator of the video file.

As explained below, the Court will **GRANT IN PART** and **DENY IN PART** ICE's Motion for Summary Judgment and will **GRANT IN PART** and **DENY IN PART** Plaintiffs' Motion for Summary Judgment, for all responsive materials except the video file. Regarding the adequacy of the searches performed, ICE's motion will be granted in part and denied without prejudice in part; Plaintiff's motion will be denied without prejudice to allow ICE to remedy the insufficiencies in its searches. Regarding ICE's withholdings under Exemptions 5, 7(C), and 7(E), both parties' motions will be denied without prejudice to allow ICE to remedy the insufficiencies in its withholding justifications. Regarding ICE's redaction of email domain names under Exemption 6, Plaintiffs' motion will be granted, and ICE's motion will be denied; for all other Exemption 6 withholdings, both parties' motions will be denied without prejudice to allow ICE to remedy the insufficiencies in its withholding justifications.

As to ICE's redaction of the name of the video narrator, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiffs' Motion for Summary Judgment Regarding Video File and will **DENY** without prejudice ICE's Motion for Summary Judgment Regarding Video File. Specifically, the Court will grant Plaintiffs' motion regarding the inapplicability of Exemption 7 to this video. As to the use of Exemption 6, the Court will deny both parties' motions without prejudice, and the Court will allow ICE to remedy its insufficient justification or else release the redacted name of the video narrator.

# I.    BACKGROUND

On April 19, 2021, Plaintiffs TLC and RDN filed six FOIA requests with ICE, seeking records that would "shine a public light on the conditions of detention for immigration detainees who identify as transgender and ICE's operation and oversight of detention facilities that house transgender detainees." Compl. ¶¶ 10, 11, 16, 19, 22; 21-cv-2155 Compl. ¶¶ 11, 16. The statutory deadline for ICE to respond to each of these requests was May 19, 2021. 5 U.S.C. § 552(a)(6)(A)(i). On August 12, 2021, having still received no response, TLC and RDN filed two lawsuits in this District to compel ICE's response pursuant to FOIA's declaratory and injunctive relief provisions. Compl. ¶¶ 25–28. The two matters were consolidated on September 23, 2021. ECF No. 10.

On February 9, 2022, ICE reported that it had completed its search for responsive records. Joint Status Report, ECF No. 17. ICE made its first production on March 11, 2022. Joint Status Report, ECF No. 19. After over two years of periodic releases, ICE finished its production, save for one video file, on July 9, 2024. Status Report Order, ECF No. 36. Given this delayed production, on July 23, 2024, this Court ordered ICE to produce the remaining video file, and also ordered a briefing schedule for summary judgment regarding 1) all records except the video file, and separately, 2) briefing specifically for the video file. July 23 Order, ECF No. 38. The next day, ICE produced the video file with the name of the narrator of the presentation "bleeped" out. Notice of Compliance with July 23, 2024 Order, ECF No. 39.

ICE moved for summary judgment on August 12, 2024 [ECF No. 40], and Plaintiffs cross-moved for summary judgment on August 19, 2024 [ECF No. 41]. Plaintiffs then moved for summary judgment regarding the video file on August 26, 2024 [ECF No. 45], and ICE cross-moved on August 30, 2024 [ECF No. 46, 48]. These motions have been fully briefed and are now ripe for this Court's review.

## II.    LEGAL STANDARDS

### A.  The Freedom of Information Act

The FOIA provides an avenue for anyone to request and receive the disclosure of government records. 5 U.S.C. § 552. "FOIA mandates a 'strong presumption in favor of disclosure.'" *A.C.L.U. v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). Therefore, "agencies may withhold only those documents or portions thereof that fall under one of nine delineated statutory exemptions." *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 845 (D.C. Cir. 2010). But because the FOIA mandates a presumption of disclosure, an agency withholding material pursuant to FOIA exemptions "bears the burden of showing that withheld material falls within the asserted exemption." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)). The agency must also show "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). In 2016, Congress passed the FOIA Improvement Act, which mandates that agencies may only withhold information under a FOIA exemption if the agency "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law," a condition referred to as the "foreseeable harm" requirement. 5 U.S.C. § 552(a)(8)(A)(i); *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 357–58 (D.C. Cir. 2021).

### B.  Summary Judgment

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). FOIA cases are usually decided on summary judgment motions. *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Where the party seeking disclosure

4

challenges an agency's withholding or redaction of records, "the agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested . . . is wholly exempt from [the FOIA's] disclosure requirements." *Shapiro v. Dep't of Just.*, 34 F. Supp. 3d 89, 94 (D.D.C. 2014) (citing *Moayedi v. U.S. Customs & Border Prot.*, 510 F. Supp. 2d 73, 78 (D.D.C. 2007). An agency meets this burden if any combination of its *Vaughn* index, affidavits, or declarations "describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). "A *Vaughn* index in combination with agency declarations is the typical way agencies provide courts with the information required." *Comptel v. F.C.C.*, 910 F. Supp. 2d 100, 111 (D.D.C. 2012). An agency's justifications will be upheld if they are "logical" or "plausible." *Wolf v. Cent. Intel. Agency*, 473 F.3d 370, 375 (D.C. Cir. 2007) (citations omitted). The court also "must make specific findings" as to whether any "reasonably segregable portion of a record" is non-exempt and releasable "[b]efore approving the application of a FOIA exemption." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citing 5 U.S.C. § 552(b)).

## III.    DISCUSSION

ICE withheld records under FOIA Exemptions 5, 6, 7(C), and 7(E) and withheld the name of the narrator in a video file under Exemptions 6 and 7(C). Exemption 5 protects "privileged communications within or between agencies"; Exemption 6 protects "information that, if disclosed, would invade another individual's privacy"; Exemption 7 protects information "compiled for law enforcement purposes" that (C) "could reasonably be expected to constitute an unwarranted invasion of personal privacy"; (E) "[w]ould disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *See* 5 U.S.C. § 552(b).

In support of its motion for summary judgment, ICE submitted the Declaration of ICE FOIA Officer Fernando Pineiro ("Pineiro Decl."), ECF No. 40-2. ICE did not provide a *Vaughn* index. *See Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) (creating a "system of itemizing and indexing" for agencies invoking FOIA exemptions to "correlate statements made in the . . . refusal justification with the actual portions of the document"). However, an agency may submit materials in "any form . . . so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *Gallant v. Nat'l Lab. Rels. Bd.*, 26 F.3d 168, 173 (D.C. Cir. 1994).

Based on the Pineiro Declaration and ICE's briefing, the Court will first address the adequacy of the search. Then, it will review ICE's withholdings under the FOIA exemptions. Because the Court ordered the parties to brief production of the video file separately and the parties have filed separate motions for summary judgment on that issue, the Court will separately consider the use of Exemptions 6 and 7(C) to withhold the name of the video narrator.

**A. The Adequacy of the Search**

ICE must first demonstrate that it conducted an adequate search. The standard of review is whether "the materials submitted by the agency satisfactorily demonstrate the apparent adequacy of the search conducted." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). To show adequacy, "the agency must demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (internal quotations omitted). The adequacy of the search "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (citing *Steinberg v. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994)).

Upon receipt of Plaintiffs' FOIA requests, the ICE FOIA Office identified three internal program offices that would likely have responsive records: 1) the Office of Professional Responsibility, 2) the Office of Policy, and 3) the Enforcement and Removal Operation Unit. Pineiro Decl. ¶ 17.  Specifically, the searches were conducted as follows:

(1) The Office of Professional Responsibility, Office of Detention and Oversight searched its Inspection Modernization System using the terms "Detainee Questionnaire," "Detainee Comments," and "Transgender."  *Id.* ¶ 20.

(2) The Office of Policy searched the electronic ICE Policy Manual system and the division's shared drive using the terms "Transgender," Intersex," and "Vulnerable Populations."  *Id.* ¶ 22.

(3) The Enforcement and Removal Operation Unit tasked the following subordinate program offices with conducting a search: (a) the Office of Policy Division; (b) the ICE Health Service Corps; (c) the Custody Management Division; (d) the archived emails of Andrew Lorenzen-Strait; and (e) the Law Enforcement Systems and Analysis Division.  ICE Mot. at 7; Pineiro Decl. ¶ 25.[1]

As explained below, the Court finds that these searches are a mixed bag; several of the searches are insufficient. To remedy this, the Court concludes that "the government should be afforded the opportunity to supplement its showing (or re-run its searches) and file a renewed motion for summary judgment*." Lawyers' Comm. for Civ. Rts. Under L. v. Dep't of Just.*, No. 18-

---

[1] The Court will not reproduce the details of every one of the Enforcement and Removal Operation Unit's searches here, as there are multiple iterations of searches within these subordinate offices, but the Court will instead highlight the searches that were referenced explicitly in Plaintiffs' motion as inadequate.

cv-167 (EGS/GMH), 2020 WL 7319365, at *8 (D.D.C. Oct. 16, 2020), *report and recommendation adopted*, 2021 WL 1197730 (D.D.C. Mar. 30, 2021).

### 1.  ICE's Searches of Requested Email Inboxes

Plaintiffs first argue that ICE's search is inadequate because of the "failure to search the email archives of two ICE officials specifically named in Plaintiffs' requests."  Pls.' Mot. at 1. Specifically, Plaintiffs' FOIA request sought "[a]ll correspondence, including emails, letters and internal memoranda, containing the terms 'transgender' and/or 'intersex' . . . from January 1, 2015 to the present," for three individuals: 1) Andrew R. Lorenzen-Strait of DHS/ICE/ERO/Custody Programs, 2) Lana Khoury of DHS/ICE/ERO/Custody Programs, and 3) Captain Edith Lederman, M.D., M.P.H. of the ICE Health Services Corps.  Compl. ¶ 22; Pls.' FOIA Request, ECF No. 1-7. ICE states that it searched the archived emails of Andrew Lorenzen-Straight, Pineiro Decl. ¶ 25(d), but Plaintiffs observe that ICE did *not* state that it searched for files belonging to Lana Khoury or Capt. Edith Lederman.  Pls.' Mot. at 11.  Plaintiffs characterize such failure as a "glaring and fatal deficiency."  *Id.*  In ICE's reply brief, however, the agency represents that "it did indeed search ICE officials identified in Plaintiffs' FOIA requests."  ICE Mot. at 2.  To support this contention, ICE included a Supplemental Pineiro Declaration ("Supp. Pineiro Decl."), ECF No. 43-1, stating that "[t]wo of these individuals were not specifically named in my declaration, rather their titles were named, to protect the privacy interests of these non-public facing ICE employees."  *Id.* ¶ 6. But then, in Plaintiffs' reply, Plaintiffs retort that "ICE does not explain how omitting from its declaration the names of two government officials Plaintiffs specifically named in their requests could possibly protect their privacy."  Pls.' Mot. at 3 n.1.

Not only does the Court agree with Plaintiffs that ICE's privacy-protecting justification is unavailing in this context, but the Court also cannot conclusively identify the search in which ICE

used the titles of those two individuals, as it claims to have done. The Court suspects that, regarding Plaintiffs' request for correspondence of Capt. Edith Lederman, the following portion of ICE's declaration is intended to be responsive: "Within the ICE Health Service Corps, the Lead of the Infectious Disease Program conducted a search of the ICE Health Service Corps SharePoint . . . ." Pineiro Decl. ¶ 25(b); *see* Edith R. Lederman, RESEARCHGATE, https://www.researchgate.net/profile/Edith-Lederman (identifying Edith Lederman as the Lead of the Infectious Disease Program at ICE). The Court is unable to identify the applicable portion of the declaration regarding Plaintiffs' request for Lana Khoury's correspondence—it appears that Ms. Khoury's title is Senior Advisor for LGBTI Care, *see* HUMANRIGHTSWATCH, https://www.hrw.org/sites/default/files/report_pdf/us0316_web.pdf, but such title does not appear anywhere in ICE's declaration or motion. The Court is "left guessing as to what may have caused the alleged discrepancy here." *Dillon v. U.S. Dep't of Just.*, No. 17-cv-1716 (RC), 2019 WL 249580, at *7 (D.D.C. Jan. 17, 2019).

To remedy this lack of clarity in ICE's filings and ensure that ICE did indeed conduct a search of Edith Lederman and Lana Khoury's correspondence, this Court will order ICE to file a further declaration confirming the search of these two individuals' communications, just as ICE has already done with the search of Andrew Lorenzen-Strait's archived emails. *See, e.g., Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183 (D.D.C. 2013) ("Where an agency's declarations are insufficient to support a finding that its search was adequate, courts 'generally will request that an agency supplement its supporting declarations . . . .'") (quoting *Wolf v. CIA*, 569 F. Supp. 2d 1, 10 (D.D.C. 2008)). The declaration must confirm these two individuals by name, given ICE's failure to identify a compelling reason for redacting them.

### 2. Adequacy of ICE's Search Terms

Plaintiffs next argue that ICE used "facially inadequate search terms" in many of the subordinate divisions' searches. Pls.' Mot. at 1. Plaintiffs start by identifying one of ICE's searches that they *do* believe is adequate: within the Enforcement and Removal Operation Unit, Plaintiffs' approve of the Custody Management Division's search of digital files, which used specific case numbers as well as thirty search terms with extenders such as "transgender," "intersex," "trans g*," "trans w*," "trans m*," "trans p*," "trans sex*," "transg*," "transw*," "transm*," "transp*," and "transsex*."[2] Pls.' Mot at 12 (citing ICE Mot. at 9). Plaintiffs then compare that search with three of ICE's other searches that Plaintiffs deem inadequate: 1) within the Enforcement and Removal Operation Unit, the Health Service Corps Lead of Infectious Disease Program's SharePoint search using only the terms "transgender training," "transgender policy," "transgender clinical," "guideline," and "transgender directive"; 2) within the Enforcement and Removal Operation Unit, the eClinicalWorks search using the terms "transgender report," "transgender grievance," "grievances," and "patient medical records," as well as using various diagnostic codes and the transgender check box; and 3) within the Office of Professional Responsibility, the Office of Detention and Oversight Modernization System search using the terms "detainee questionnaire," "detainee comments," and "transgender." Pls.' Mot. at 11–12; Pineiro Decl. ¶¶ 25(b), 20. With this comparison as a backdrop, Plaintiffs argue it "show[s] that (a) it is possible for ICE to search using a comprehensive list of specific search terms, and (b) that the use of a smaller subset of vague terms is insufficient." Pls.' Mot. at 11.

---

[2] The asterisk symbol ("*") indicates a "wildcard" search that would return any results containing the precise combination of letters before the asterisk. *Am. Oversight v. Off. of Mgmt. & Budget*, 613 F. Supp. 3d 219, 223 (D.D.C. 2020).

However, Plaintiffs cite no authority, and this Court is aware of none, for the proposition that an agency's various departments must use consistent search terms across the board. Just because one of the ICE divisions conducted an exceptionally thorough search, that does not necessarily render all other searches inadequate. ICE is "only held to a standard of reasonableness; as long as this standard is met, a court need not quibble over every perceived inadequacy in an agency's response, however slight." *Physicians for Hum. Rts. v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009). Therefore, each search must be evaluated under a framework of reasonableness, rather than one of maximal comprehensiveness.

That said, examining ICE's searches with a standard of reasonableness, the Court still finds some of the searches to be unreasonable based on a deficiency identified by Plaintiffs: Nearly every one of Plaintiffs' FOIA requests asked for information regarding "transgender and/or intersex"[3] inmates in ICE custody, but not all of ICE's searches use the term "intersex."

It is true that "there is no bright-line rule requiring agencies to use the search terms proposed in a FOIA request." *Physicians for Hum. Rts. v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009). But "intersex" is not simply a proposed term: rather, it is a population of inmates not necessarily encompassed by the term "transgender," because "transgender" and "intersex" have different meanings. "Transgender" refers to individuals who identify with a gender that is different than their birth sex, and "intersex" refers to individuals born with reproductive or sexual anatomy that does not fit into a male or female sex classification. *See Intersex*, CLEVELAND CLINIC (July 19, 2022), https://my.clevelandclinic.org/health/articles/16324-intersex (https://perma.cc/98RD-5MHD) ("Being intersex . . . [is] not the same as being

---

[3] Agencies have a "duty to construe a FOIA request liberally." *Nat'l Mag., Wash. Bureau v. U.S.C.S.*, 71 F.3d 885, 890 (D.C. Cir. 1995). Therefore, the proper way to construe Plaintiffs' FOIA requests is that they were requesting information on inmates who are either transgender, intersex, or both—not that the agency can selectively pick which of the plaintiffs' named inmate populations to search for and which to ignore.

transgender.  A person who is transgender identifies with a gender that's different than the sex they

were assigned at birth.  A person who is intersex *may* be transgender if their gender identity doesn't

match the sex they were assigned or raised as.") (emphasis added); *Terminology*, CENTERS FOR

DISEASE CONTROL AND PREVENTION (Nov. 19, 2024), https://www.cdc.gov/healthy-youth/lgbtq-

youth/terminology.html (https://perma.cc/QY5N-ZR48) (defining intersex as "persons with

variations in physical sex characteristics, including variations in anatomy, hormones,

chromosomes or other traits, that differ from expectations generally associated with male and

female bodies," and separately defining transgender as "individuals whose current gender identity

differs from the sex they were assigned at birth"); *see generally* Leora F. Eisenstadt, Fluid Identity

Discrimination, 52 Am. Bus. L. J. 789, 791 (2015) (defining "individuals who are transitioning

from their birth sex to another sex" as transgender, and distinguishing them from "individuals born

with intersex characteristics").  ICE's searches inconsistently include the term "intersex," but

Plaintiffs specifically requested information about "transgender and/or intersex" populations in

every enumerated FOIA request (save for one).  See Compl. ¶¶ 11, 16, 19, 22.  Failing to include

"intersex" as a search term is, in this Court's view, unreasonable. Therefore, for the searches where

ICE failed to include the term "intersex" in any capacity, this Court orders ICE to re-run those

searches to ensure that information about intersex inmates is returned.[4]

Plaintiffs urge this Court to go further, deeming any search short of the broadest, most

inclusive list of variations of the term "transgender" to be unreasonable.  To support this argument,

---

[4] In addition to the three searches identified by Plaintiffs as insufficient, the Court observes that there are several other Enforcement and Removal Operation Unit searches that failed to use the term "intersex" at all: 1) within ICE Health Services Corps, a search of the Policy Development System database using the terms "Covid 19," "training," "transgender," "medical care," "medical health," "mental care," and "mental health"; 2) within ICE Health Services Corps, a search by the Medical Countermeasures Program Coordinator of various shared drives and SharePoint using the terms "transgender" and the specific names and Alien Registration Numbers of transgender and/or intersex detainees (without using the term "intersex"); 3) within ICE Health Services Corps, a search of "hard drives and shared drives" by the Health Records Technology Office Program Officer using the term "transgender report."  Pineiro Decl. ¶ 25(b).

Plaintiffs cite to *Bagwell v. Dep't of Just.*, in which the court found a search for files containing "Pennsylvania State University" without including other "names commonly used to refer to the University" like "PSU" or "Penn State" to be inadequate. 311 F. Supp. 3d 223, 229–230 (D.D.C. 2018); Pls.' Mot. at 12. The court reasoned that "in common conversation the University is more likely to be referred to as 'Penn State' or 'PSU,'" so failing to include those terms in the search was insufficient. 311 F. Supp. 3d at 230. Plaintiffs also rely on *Am. Oversight v. Dep't of Homeland Sec.*, in which the court found that a search of ICE reports was inadequate for failing to use variations of detainees' names—particularly "given that the naming conventions in the ICE reports appear to depart from the detainees' full names." 691 F. Supp. 3d 109, 115 (D.D.C. 2023).

Here, however, variations of the term "transgender" are not nearly as commonplace as the variations of search terms in *Bagwell* and *American Oversight*, where the variations were used interchangeably—or were even *more* common that the search term the agency employed. While the Court commends the Enforcement and Removal Operation's Custody Management Division for using a broad swath of search terms, including "trans g*," "trans w*," "trans m*," "trans p*," "trans sex*," "transg*," "transw*," "transm*," "transp*," and "transsex*," each ICE department was entitled to conduct its search for documents relating to transgender people using the term most commonly associated with that population—to wit, "transgender." "Where the agency's search terms are reasonable, the Court will not [micromanage or] second guess the agency regarding whether other search terms might have been superior." *Liberation Newspaper v. Dep't of State*, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015).

Lastly, Plaintiffs take issue with the ICE searches that failed to use "transgender" as a standalone term. Pls.' Mot. at 11–12. The searches using only compound terms are: 1) the Health Services Corps' Lead of Infectious Disease Program's search of SharePoint, using the terms

"transgender training," "transgender policy," "transgender clinical," "guideline," and "transgender directive"; and 2) the Health Services Corps' search of eClinical Works, with the terms "transgender report," "transgender grievance," "grievances," and "patient medical record"; 3) a search of "hard drives and shared drives" by the Health Records Technology Office Program Officer using the term "transgender report."  *Id.*; Pineiro Decl. ¶ 25(b).

ICE insists that these choices were reasonable, arguing that "[t]he role of the agency is to determine the best method to search for the records the requester has described."  ICE Mot. at 3–4.  Short of any unreasonable choices, ICE is correct in its statement of the standard.  But the Court finds that ICE's use of compound terms *was* unreasonable in the context of those searches.  In reaching that conclusion, the Court relies on *Heffernan v. Azar*, 417 F. Supp. 3d 1 (D.D.C. 2019), in which the agency was searching for the "Fall 2007 Chief Operating Officer PowerPoint presentation."  *Id.* at 10.  In concluding that the use of compound search term "Fall 2007" *was* reasonable in that context, the court observed a key representation from the agency's declaration: that "other individual search words already used in previous searches, e.g. 'Fall' and '2007' from the previous searches for 'Fall 2007', [was] too broad and unreasonably burdensome for another round of searches as individually separate terms."  *See id.* at 9 (quoting the agency's declaration). Here, ICE makes no such representation—there is no reason to think that the term "transgender" by itself would render an unmanageable string of search results from those databases.  Given the inclusive nature of Plaintiffs' FOIA requests, the Court believes that using only compound search terms here is not "reasonably calculated to uncover all relevant documents," as is required under the FOIA.  *See Weisberg*, 745 F.2d at 1485.

In sum, the Court finds that the ICE searches that failed to use the term "intersex" are unreasonable and must be redone.  The Court identifies those as: 1) the Office of Professional

Responsibility, Office of Detention and Oversight Modernization System search, 2) the Health Services Corps' Lead of Infectious Disease Program's search of SharePoint, 3) the Health Services Corps' search of eClinical Works, 4) the Health Services Corps' search of the Policy Development System, 5) the Health Services Corps' Medical Countermeasures Program Coordinator's search of various shared drives and SharePoint, and 6) the Health Services Corps' Health Records Technology Office Program Officer's search of "hard drives and shared drives." ICE must re-run these searches including the standalone term "intersex."

The Court also finds that the ICE searches that only used compound terms, rather than using "transgender" and "intersex" as standalone terms, are unreasonable and must be redone. These include the Health Services Corps' Lead of Infectious Disease Program's search of SharePoint, identified as search (2) in the preceding paragraph; the Health Services Corps' search of eClinical Works, identified as search (3); and the Health Services Corps' Health Records Technology Office Program Officer's search of "hard drives and shared drives," identified as search (6). In addition to re-running these searches with the standalone term "intersex," ICE must also re-run these searches with the standalone term "transgender."

For all other searches, ICE has met its burden of showing reasonableness.

### B. The FOIA Exemptions Applied by ICE

ICE invoked Exemptions 5, 6, 7(C), and 7(E) to withhold or redact portions of records, and ICE also withheld the name of the presentation narrator in the video file under Exemption 6 and 7(C). The Court will address the use of each Exemption in turn.[5]

---

[5] Plaintiffs organized their cross-motion by first challenging the adequacy of the search, then launching a blanket challenge to the specificity of all of ICE's redactions and withholdings, followed by another blanket challenge to ICE's showing of foreseeable harm for all redactions and withholdings. Pls. Mot. at 2. The Court, however, believes it is more logical to challenge specificity and foreseeable harm within the context of each asserted Exemption. Therefore, the Court will address Plaintiffs' specificity and foreseeable harm challenges as they apply to each of ICE's asserted Exemptions.

### 1.  Exemption 5

Exemption 5 protects from FOIA's disclosure requirements "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This language has been construed as covering materials "normally privileged in the civil discovery context."  *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  In other words, "Exemption 5 permits an agency to withhold internal documents that would be privileged or otherwise undiscoverable in civil litigation."  *Stonehill v. I.R.S.*, 534 F. Supp. 2d 1, 4 (D.D.C. 2008).  Documents that would be privileged in the discovery context include materials protected by the work product privilege, the attorney-client privilege, and the deliberative-process privilege.  *Sears, Roebuck &Co.*, 421 U.S. at 149.  ICE invoked the attorney-client privilege and the deliberative-process privilege to justify its Exemption 5 withholdings.

As explained below, the Court finds that ICE has failed to properly support its Exemption 5 withholdings.  In keeping with other courts faced with the same situation, the Court will deny ICE's motion for summary judgment and "give the agency the choice to 'disclose those documents or file supplemental submissions indicating in sufficient detail why withholding is proper.'" *Lawyers' Comm. for Civ. Rts. Under L.*, 2020 WL 7319365, at *31 (quoting *Shurtleff v. EPA*, 991 F. Supp. 2d 1, 20 (D.D.C. 2013)); *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 69 ("[T]he Court will deny summary judgment to the defendant regarding its Exemption 5 withholding determinations . . . . [T]he defendant may either supplement its declarations demonstrating the applicability of Exemption 5 or disclose the [ ] records withheld under that exemption.").

*(i) Attorney-Client Privilege*

The attorney-client privilege covers "confidential communications between an attorney and [their] client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977). In the governmental context, the "client" may be a government official or agency, "and the attorney may be an agency lawyer." *CREW v. Dep't of Just.*, 538 F. Supp. 3d 124, 135 (D.D.C. 2021) (citation omitted), *aff'd*, 45 F.4th 963 (D.C. Cir. 2022). A "fundamental prerequisite to the assertion of the privilege" is "confidentiality both at the time of the communication and maintained since." *Nat'l Press Club Journalism Inst. v. ICE*, No. 18-cv-2932 (RC), 2023 WL 9001337, at *12 (D.D.C. Dec. 28, 2023) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)). The government bears the burden of proving, through "detailed and specific information," that the withheld information falls within the attorney-client privilege. *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998).

Here, ICE relied on the attorney-client privilege to redact communications between attorneys from ICE's Office of the Principal Legal Advisor and their intra-agency clients (namely, the ICE Enforcement and Removal Operations Unit and ICE Health Services Corps personnel) "relating to the legal issues pertaining to the transfer, parole and litigation of transgender detainees." ICE Mot. at 12–13; Pineiro Decl. ¶ 32. ICE listed Bates numbers[6] 2021-ICLI-00061-2310, 2376, 5901-5902, 7146, 7186, 7242, and 7375 to identify the documents supposedly covered by the privilege. Pineiro Decl. ¶ 32. Plaintiffs argue that 1) ICE has not provided sufficient

---

[6] A Bates number, also known as a Bates-stamp number, is "[t]he identifying number or mark that is affixed to a document or to the individual pages of a document in sequence, usually by numerals but sometimes by a combination of letters and numerals. The term gets its name from a self-advancing stamp machine made by the Bates Manufacturing Company." *Bates-stamp Number*, BLACK'S LAW DICTIONARY (12th ed. 2024).

information to show that the privilege applies, and 2) ICE asserted the privilege for four documents that do not actually contain any attorney-client redactions.  Pls.' Mot. at 2.

Regarding the first argument, Plaintiffs observe that ICE has not offered any details to show that the communications were confidential, beyond declaring "in conclusory fashion" that "'the withheld information has only been shared with the client office employees.'"  Pls.' Mot. at 28 (quoting Pineiro Decl. ¶ 32).  Plaintiffs argue, for example, that the redacted emails "do not contain any markings indicating they were confidential or otherwise restricted or that they contain information provided to counsel in confidence."  *Id.*  In response, ICE retorts that "[t]he [attorney-client] privilege does not require that ICE provide details that each document or communication was labeled with 'restricted' or 'confidential.'"  ICE Mot. at 8.

While ICE is correct that the use of the privilege does not require such labeling, Plaintiffs prevail all the same.  ICE *is* required to show that specific steps were taken to preserve the confidentiality of the communication.  *Nat'l Press Club*, 2023 WL 9001337, at *13.  "An agency may satisfy this burden by 'demonstrat[ing] that confidentiality was expected in the handling of the[ ] communications [at issue], and that it was reasonably careful to keep this confidential information protected from general disclosure,' not just within the agency, but also among any other individuals outside the agency who needed access to the information."  *Id.* (citing *Cuban v. S.E.C.*, 744 F. Supp. 2d 60, 79 (D.D.C. 2010) (internal quotations omitted).  Here, ICE's declaration "say[s] nothing about the steps that the agency took to protect the withheld information from general disclosure."  *Nat'l Press Club*, 2023 WL 9001337, at *13.  Therefore, ICE "must provide additional detail regarding the steps it took to reasonably ensure that the information contained within the documents remained confidential at all times."  *Id.*  The Court will order ICE to provide that additional detail, or else produce any material withheld or redacted pursuant to

attorney-client privilege that is not protected by some other privilege.  Additionally, ICE must demonstrate in its supplemental filings that each withheld communication was made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding."  *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007).  And of course, as with all other withholdings, ICE must describe with reasonable particularity the "foreseeable harm" that would result from disclosure.  U.S.C. § 552(a)(8)(A)(i); *Reps. Comm. for Freedom of the Press*, 3 F.4th at 357–58.

Regarding Plaintiffs' second argument—that four of ICE's documents do not actually contain any designated attorney-client privilege redactions and must be erroneously listed—ICE concedes that those four pages were incorrectly transcribed in their original declaration, and that the correct Bates numbered pages are 6646, 6686, 6742, and 6875 (instead of 7146, 7186, 7242, and 7375).  Suppl. Pineiro Decl. ¶ 7.  But, as Plaintiffs observe in their reply, those Bates numbers are *still* wrong; none of those four pages contain any Exemption 5 redactions.  Pls.' Reply at 15; Third Declaration of Matthew E. Kelly Exs. 9–12, ECF No. 47-2, 47-3, 47-4, 47-5.  Given these errors, Plaintiffs argue that "ICE's inability to correlate its purported attorney-client privilege withholdings with specific pages in its production calls all of its descriptions of its redactions into serious question."  Pls.' Reply at 15.

The Court also believes that ICE's repeated errors are unacceptable, but not enough to infer intentionality or bad faith.  *See Leopold v. Dep't of Justice*, 130 F. Supp. 3d 32, 42 (D.D.C. 2015) ("Although the Brinkmann Declaration contained errors, those errors are not indicative of bad faith. Mistakes alone do not imply bad faith."); *Fischer v. U.S. Dep't of Justice*, 723 F. Supp. 2d 104, 109 (D.D.C. 2010) ("To be sure, defendant has not performed its duties under FOIA perfectly, but error-free performance is not required.").  Instead, the Court will conclude that the only

documents relying on the attorney-client privilege are 2021-ICLI-00061-2310, 2376, 5901 and 5902, and all other invocations of the attorney-client privilege as waived.

### (ii) Deliberative-Process Privilege

Exemption 5 also encompasses the deliberative-process privilege, which allows agencies to withhold communications that are both "predecisional and deliberative." *Jud. Watch, Inc. v. U.S. Dep't of State*, 349 F. Supp. 3d 1, 7 (D.D.C. 2018). Communication is "predecisional" if it is "antecedent to the adoption of an agency policy," *id.* (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (internal quotation marks omitted), and "deliberative" if it reflects the "give-and-take" of decisionmaking, meaning that it "covers recommendations, draft documents, proposals, suggestions, and other subjective documents" conveying the author's judgment. *Id.* (quoting *Coastal States*, 617 F.2d at 866).

Here, ICE relies on the deliberative-process privilege to withhold "emails between the Enforcement and Removal Operations Unit and ICE Health Services Corps." ICE Mot. at 15; Pineiro Decl. ¶ 29. ICE provides a long list of topics discussed in these emails. Some examples are: 1) "recommendations to improving training slides and policy documents relating to transgender and LGBT detainees, including recommended edits, thoughts, concerns and suggestions on the updates to and creation of these records;" 2) "how to respond to or engage with [NGOs] and the media regarding transgender detainees, transgender transfers, and transgender detainee complaints;" and more, with corresponding Bates numbered pages. Pineiro Decl. ¶ 29. ICE also relies on the deliberative-process privilege to withhold "various draft documents of transgender care memorand[a], contract modifications, training slides, and checklists, which all contain 'draft' watermarks as well as red-lined edits and comments." *Id.* ¶ 30. ICE then lists the drafts that were withheld with corresponding bates numbers, as well as bates numbers for the final

20

versions of those drafts.  *Id.*  Plaintiffs make three challenges to ICE's use of the deliberative-process privilege.

Plaintiffs' broadly challenge ICE's use of the deliberative-process privilege because the Pineiro declaration, even though it provides Bates numbers for the withheld records, "still lacks the specificity that the law requires."  Pls.' Mot. at 13.  As an example, Plaintiffs take issue with the description—reproduced in the preceding paragraph—that reads, "recommendations to improving training slides and policy documents relating to transgender and LGBT detainees," because this "vague and broad" description was tied to "41 scattered pages in ICE's productions."  Pls.' Mot. at 13.  Other "vague and broad" descriptions were used to withhold "a set of 39 pages and two set of 23 pages each."  *Id.*  The Pineiro declarations, Plaintiffs argue, "fall far short of the well-defined requirement that they set forth 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."  Pls.' Reply at 4 (quoting *Mead Data Cent., Inc.*, 566 F.2d at 250–51).

Plaintiffs' next argument is that ICE has failed to show that foreseeable harm will result from disclosure—a required showing under the FOIA Improvement Act of 2016.  Pls.' Mot. at 16; *see also* 5 U.S.C. § 552(a)(8)(A)(i).  ICE contends that release of the withheld emails will foreseeably "discourage the expression of candid opinions, and inhibit the free and frank exchange of information among agency personnel," resulting in a "chilling effect."  Pineiro Decl. ¶ 29. Regarding the withheld drafts, ICE argues that disclosure "could cause foreseeable harm by misleading the public" and "cause the same chilling effect."  *Id.*  Plaintiffs contend that ICE's descriptions of foreseeable harm are "merely 'mouthing the generic rationale for the deliberative-process privilege itself,'" Pls.' Mot. at 16 (quoting *Reps. Comm. v. F.B.I.*, 3 F.4th 350, 369 (D.C.

Cir. 2021)), and that ICE is required to show that foreseeable harm *would* result, not *could* result. *Id.* at 16–17 (citing *Reps. Comm.*, 3 F.4th at 369–370 ("In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations.")).  In response, ICE insists that it has shown foreseeable harm, comparing its descriptions of harm to the descriptions by the agency in *Machado Amadis v. Dep't of State*, 971 F.3d 364 (D.C. Cir. 2020).  ICE Mot. at 13–14.  However, Plaintiffs then counter that the explanation in *Machado Amadis* was "far more detailed and specific than the boilerplate ICE offers here," by specifically identifying line attorneys' work for senior-level review in the withheld "Blitz Forms" at issue in that case.  Pls.' Reply at 7.  As Plaintiffs correctly note, a "'perfunctory state[ment] that disclosure of all the withheld information—regardless of category or substance— would jeopardize the free exchange of information between senior leaders within and outside of the [agency]' will not suffice."  *Reps. Comm.*, 3 F.4th at 370 (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018)).

Lastly, Plaintiffs argue that ICE has failed to show that the documents being withheld under the deliberative process privilege are actually predecisional and deliberative.  Plaintiffs observe that ICE failed to identify, "at least by rank or job title," the authors and recipients of the emails. Pls.' Mot. at 26; Pls.' Reply at 12.  ICE asserts that it identified the authors and recipients by stating broadly that the documents were circulated "amongst the Enforcement and Removal Operation and ICE Health Services Corps employees . . . for the purpose of making recommendations to senior Enforcement and Removal Operation and ICE Health Service Corps employees and officers for their final decision."  ICE Mot. at 15; ICE Reply at 10–11.  And specifically for the draft documents that ICE withheld, ICE argues that "[b]y their very nature, draft documents are

predecisional" and "[a]ll the draft documents withheld . . . contain edits, marginal suggestions and comments, or embedded questions regarding content." ICE Mot. at 17. Plaintiffs, however, note that draft documents are not automatically exempt from disclosure, *see Judicial Watch v. D.O.J.*, 20 F.4th 49, 56 (D.C. Cir. 2021), and that ICE has failed to provide the necessary information to invoke the deliberative-process privilege:

> The 'who,' i.e., the roles of the document drafters and recipients and their places in the chain of command; the 'what,' i.e., the nature of the withheld content; the 'where,' i.e., the stage within the broader deliberative process in which the withheld material operates; and the 'how,' i.e., the way in which the withheld material facilitated agency deliberation.

*Id.* Instead, ICE has bucketed many email communications and draft documents together as eligible for withholding under the deliberative-process privilege, without individualized explanation.

Whether it is because of a failure to show foreseeable harm, or a failure to show the predecisional and deliberative nature of the documents, or a basic lack of specificity in the declaration itself, the Court agrees with Plaintiffs that ICE's use of the deliberative-process privilege is not adequately supported for either the emails or draft memoranda.

Regarding the withheld emails, the Court is unable to identify the author and recipient of each email, because ICE merely buckets all emails as "amongst the Enforcement and Removal Operation and ICE Health Service Employees . . . for the purpose of making recommendations to senior Enforcement and Removal Operation and Ice Health Service Corps employees and officers." ICE Reply at 11. Although ICE insists that this description "clearly identifie[s] the authors and recipients," this Court cannot draw anything from that description. Are all emails one-way, from junior to senior? Which office is the originator, and which office is on the receiving end? These questions are left unanswered by ICE's description. For ICE to prevail on summary

judgment, the Court must be able to assess "the nature of the decisionmaking authority vested in the document's author and recipient." *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 55, 69 (D.D.C. 2013)); *see also Judicial Watch, Inc. v. Dep't of Just.*, 20 F.4th 49, 56 (D.C. Cir. 2021) (explaining that the agency must reveal the "relative positions in the agency's chain of command occupied by the document's author and recipient"). This shortcoming in ICE's descriptions overlaps with Plaintiffs' two other challenges; that ICE has failed to provide the requisite specificity in their description of a large set of withheld emails, and that a blanket statement of foreseeable harm—essentially restating the rationale for the deliberative-process exemption in the first place—is insufficient to invoke the deliberative process privilege. Therefore, ICE must provide better support for its withheld emails under the deliberative process privilege.

Regarding the withheld draft memoranda, the Court similarly agrees with Plaintiffs that critical information is missing from ICE's descriptions of these drafts. Although drafts are "typically" predecisional and deliberative, *see Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983), this is not automatically true, *see Wilderness Soc'y v. Dep't of the Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004). As explained *supra*, ICE must identify the "who," "what," "where," and "how" for each draft document, which it has failed to do. Additionally, ICE must indicate whether the draft was "(1) 'adopted formally or informally, as the agency position on an issue;' or (2) 'used by the agency in its dealings with the public.'" *Wilderness Society*, 344 F. Supp. 2d at 14 (quoting *Judicial Watch v. United States Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004)). "The need to describe each withheld document when Exemption 5 is at issue is particularly acute because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Nat'l Press Club*, 2023 WL 9001337, at *9 (quoting *New Orleans Workers' Ctr. for Racial Just. v. ICE*, 373 F. Supp. 3d 16,

50 (D.D.C. 2019)) (internal quotations omitted).  For these reasons, ICE's attempt to withhold a series of "draft" documents is not sufficiently supported.

To remedy these inadequacies, the Court concludes that ICE must file a *Vaughn* index including the necessary foundation to withhold each individual document under the deliberative-process privilege, or else disclose the documents in full.  *See Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 308 (D.D.C. 2013) ("[T]he Court will deny summary judgment to the [defendant] regarding its Exemption 5 withholding determinations that invoke the deliberative process privilege . . . . The defendant may either supplement its declaration demonstrating the applicability of the deliberative process privilege to the information contained in these [ ] documents or disclose that information to the plaintiff.").  The *Vaughn* index must include "a description of each document withheld or redacted and an explanation of the reasons for non-disclosure." *Jud. Watch, Inc.*, 297 F. Supp. 2d at 257.  And the Court once again emphasizes the requirement that ICE describe with reasonable particularity the "foreseeable harm" that *would* result from disclosure. U.S.C. § 552(a)(8)(A)(i); *Reps. Comm. for Freedom of the Press*, 3 F.4th at 357–58.

## 2.  Exemption 7 Threshold: "Law Enforcement Purposes"

ICE withheld information pursuant to Exemption 7, subsections (C) and (E).  But for those subsections to apply, the information must meet the "law enforcement purposes" threshold; Exemption 7 only protects from disclosure "records or information compiled for law enforcement purposes" to the extent that disclosure would cause a harm enumerated in Exemption 7's subsections.  5 U.S.C. § 552(b)(7).  In assessing this threshold, the "focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate[ ] to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Just.*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (citations and internal quotations omitted).  "If the records at issue do not involve an ongoing law enforcement investigation, 'materials may still meet

25

the threshold . . . if they are akin to guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation." *Roseberry-Andrews v. DHS*, 299 F. Supp. 3d 9, 31 (D.D.C. 2018) (quoting *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 365 (D.D.C. 2017)) (internal quotations omitted).

Here, as a bare attempt to meet the "law enforcement purposes" threshold, ICE merely states that "[t]he records and information at issue in this matter pertain to ICE's obligation to enforce the immigration laws of the United States by investigating non-U.S. individuals who may be present in the United States illegally, including records of interviews, arrests, bookings, detentions, removals, and other related investigations." Pineiro Decl. ¶ 35. This showing plainly fails to meet the Exemption 7 threshold. In fact, ICE's *exact* language offered in this matter (other than changing the word "relates" to "pertains") was rejected by another court in this district as insufficient to meet the law enforcement purposes threshold. *Nat'l Press Club*, 2023 WL 9001337, at *15. As ICE undoubtedly knows, "not every document compiled by a law enforcement agency is compiled for a law enforcement purpose." *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 159 (D.D.C. 2017); *see also Am. Immigr. Council v. DHS*, 950 F. Supp. 2d 221, 245–46 (D.D.C. 2013) (rejecting ICE's explanation that because the FOIA requests related to "activities that ICE performs in a law enforcement . . . context," the records automatically satisfy the "law enforcement purposes" threshold); *New Orleans Workers' Ctr. for Racial Just.*, 373 F. Supp. 3d at 56–57 (ICE's "broad and conclusory assertion" in the agency's declaration that all responsive records were compiled for law enforcement purposes "falls far short of satisfying its [Exemption 7] burden").

ICE cites to *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982) to argue that "'a court can accept less than exacting proof' about the purpose of records when the agency's 'principal mission' is to enforce the law." ICE Reply at 19. But here, ICE has not offered *any* proof regarding

the purposes of the records. ICE merely states that the records "pertain to ICE's obligation to enforce the immigration laws . . . by investigating [illegal aliens]." Pineiro Decl. ¶ 35; ICE Reply at 20. ICE spends the rest of its argument providing support for the claim that ICE is a law enforcement agency, which is not in dispute. *Id.* Accordingly, because ICE has failed to make the requisite showing that the records at issue were compiled for law enforcement purposes, Exemption 7 cannot support ICE's withholdings.

The Court "will not examine each of the withheld documents to 'attempt to discern for itself whether the documents satisfy Exemption 7's threshold requirement.'" *Nat'l Press Club*, 2023 WL 9001337, at *16 (citing *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 57). To the extent ICE seeks to continue to withhold information pursuant to Exemption 7(C), it must provide a *Vaughn* index giving the Court a clearer picture of whether the records satisfy the law enforcement purposes threshold.

But as is common practice in FOIA cases, ICE asserted Exemption 6 in conjunction with Exemption 7(C) to cover many of the same withholdings. *See Voinche v. F.B.I.*, 412 F. Supp. 2d 60, 68 (D.D.C. 2006) (Lamberth, J.) ("FOIA Exemption 7(C) overlaps with Exemption 6 in that it also protects against unwarranted intrusions of personal privacy, but Exemption 7(C) is limited to information compiled for law enforcement purposes. . . However, due to the sensitive nature of law enforcement records and the greater privacy interest in such records, the burden on an agency seeking protection of Exemption 7(C) is less than it is for Exemption 6 protection . . . ."). Because Exemption 7 was not properly supported here, the Court will go on to evaluate ICE's privacy withholdings under Exemption 6.

### 3.  **Exemption 6**

Exemption 6 protects materials from disclosure which contain "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy[.]" 5 U.S.C. § 552(b)(6). "Similar files" include "detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (quoting H.R. Rep. No. 1497). Exemption 6 may be utilized so long as the privacy interest implicated is not *de minimis*. *Gilman v. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 10 (D.D.C. 2014) (citing *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008)). Once something beyond a *de minimis* interest is identified, the Court must determine whether the release of such information is unwarranted. *Id*. To determine whether disclosure is "unwarranted," "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *Dep't of Just. v. Reps. Comm. for the Freedom of Press*, 489 U.S. 749, 776 (1989). And the "only relevant public interest in the FOIA balancing analysis" is "the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *U.S. Dep't of Def. v. Fed. Lab. Rel. Auth.*, 510 U.S. 487, 497 (1994) (quoting *Reps. Comm. for Freedom of the Press*, 489 U.S. at 773).

Here, ICE applied Exemption 6 to withhold "the names (with the exception of senior and public-facing ICE employees . . . ), contact information, including  domain names and email addresses, office numbers, initials, and other personally identifiable  information ("PII") of third-party individuals and ICE employees." Pineiro Decl. ¶ 39. ICE withheld this information because release "would cause harm to the individual, expose the individual to identity theft and may reasonably lead to unwanted contact from persons that might seek to harm the individual." Pineiro Decl. ¶ 40. ICE also asserts that "ICE employees have received an increase in threats, intimidation and personal attacks in recent years." Id. ¶ 41.

28

As explained below, the Court finds that ICE has failed to properly support its Exemption 6 withholdings.  ICE cannot redact email domain names under Exemption 6, and summary judgment will be granted to Plaintiffs for the release of these domain names specifically.  For all of ICE's other Exemption 6 withholdings, the Court will deny ICE's motion for summary judgment and "give the agency the choice to 'disclose those documents or file supplemental submissions indicating in sufficient detail why withholding is proper.'" *Lawyers' Comm. for Civ. Rts. Under L.*, 2020 WL 7319365, at *31 (quoting *Shurtleff*, 991 F. Supp. 2d at 20).

 *i.*  *Domain Names*

ICE withheld email domain names, i.e. the portion of email addresses after the @ symbol, because "[p]ublicly disclosing domain names would make it easier for someone who is able to learn the naming conventions used by ICE to contact ICE employees or target ICE employees." Pineiro Decl. ¶ 41.  Plaintiffs argue that categorically withholding domain names is improper because they are not specific to particular individuals, and so are not protected under this privacy-focused exemption.  Pls.' Mot. at 22.

The Court agrees with Plaintiffs.  The Ninth Circuit has held the same, finding that email domains cannot be withheld pursuant to Exemption 6 because "email domains are shared by all employees within a given DHS component." *Transgender L. Ctr. v. ICE*, 46 F.4th 771, 784 (9th Cir. 2022).  The Court adopts such reasoning here—and also observes that, because ICE was already ordered to release domain names to TLC in this Ninth Circuit case, it is inaccurate for ICE to characterize domain names as "not publicized."  *See* Pls.' Mot at 22 n.2.  Furthermore, as the Ninth Circuit observed, there is a legitimate public interest in the domain names because they help litigants understand "which agencies and departments are involved in making different types of decisions."  *Id.* (quoting *Bloche*, 370 F. Supp. 3d at 59).  Therefore, there is no need for more

briefing from ICE on this point; ICE is directed to release the requested documents with the email domains unredacted, and Plaintiffs' motion for summary judgment is granted in part regarding this improper use of Exemption 6.

   ii.    *Names of ICE Employees*

   Plaintiffs also challenge the categorical withholding of the names of ICE employees under Exemption 6, arguing that ICE does not explain the criteria it used to decide which employees are public-facing and which are line level.  Pls.' Mot. at 23–24.  The D.C. Circuit has explained that agencies can take a "categorical approach" to withholding under Exemption 6.  *Nat'l Press Club*, 2023 WL 9001337, at *16 (quoting *WP Co. LLC v. U.S. Dep't of Def.*, 626 F. Supp. 3d 69, 78 (D.D.C. 2022)).  If, as here, an agency chooses to go the categorical route, it must ensure that the "the categories are sufficiently well-defined and distinct."  *Id.* (quoting *Am. Immigr. Laws. Ass'n*, 830 F.3d at 675).  In delineating different categories, the agency must consider and account for the "differentiated" privacy interests at stake.  *Id.* (citing *100Reporters*, 248 F. Supp. 3d at 164).

   Here, ICE has categorically withheld the names of all individual ICE employees "with the exception of senior and public-facing ICE employees, such as senior leaders who are identified on the ICE public-facing website or members of the Office of Public Affairs."  *See* Pineiro Decl. ¶ 39. The Court finds that this category is sufficiently defined because it accounts for the divergent privacy interests of employees in higher-profile roles as opposed to lower-profile roles.  *Cf. Nat'l Press Club*, 2023 WL 900137, at *17 (rejecting the categories of "federal employees" and "ICE employees" under Exemption 6 as "far too generic," because "ICE had not differentiated between the interests of line-level, lower-ranking employees and individuals with significantly more authority and public exposure"); *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 60 (rejecting "federal employees" as too broad a category to justify agency's Exemption 6 withholdings).

Indeed, another court in this district has held that ICE properly withheld the names of "non-leadership, lower-level ICE employees," without disclosing the exact criteria in categorizing employees as such, and without distinguishing between sensitive and non-sensitive occupations. *Roseberry-Andrews*, 299 F. Supp. 3d at 30. And in any event, the Court questions Plaintiffs' contention that ICE has provided no information on how it categorized higher-profile versus lower-profile employees: indeed, ICE explained that public facing employees include those that are identified on ICE's public website and those who work in ICE's Office of Public Affairs. *See* Pineiro Decl. ¶ 39.

However, within the category of non-public-facing employes, ICE has not adequately differentiated between ICE employees with sensitive occupations and those with non-sensitive positions. Pls.' Mot. at 23–24. ICE "must establish, at the very least, that the employees whose names have been withheld not only 'are employed in a sensitive agenc[y],' but also that they have 'sensitive occupations.'" *Lawyers' Comm. for Civ. Rts. Under L.*, 2020 WL 7319365, at *33 (quoting *Walston*, 238 F. Supp. 3d at 67) (internal quotations omitted). Here, all ICE has offered is "a conclusory declaration that all non-leadership lower level employees at [ICE] might be subject to harassment if their names were revealed," which is insufficient to justify withholding. *Id.* at *34; *see id.* at *33 ("[T]o justify the redactions of the names of employees because of feared harassment, there must be some competent evidence that disclosure of that information could lead to harassment.").

As an example of what *is* deemed sufficient, in *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 153 (D.C. Cir. 2006), the court upheld the FDA's redactions of the names and addresses of employees who developed mifepristone because the FDA "fairly asserted abortion-related violence as a privacy interest." *Id.* at 153. The FDA had submitted "supporting affidavits

31

detail[ing] evidence of abortion clinic bombings. . . .[and] describ[ing] websites that encourage readers to look for mifepristone's manufacturing locations and then kill or kidnap employees once found." *Id.* Here, however, ICE has made no such showing. There is no evidence in the Pineiro declaration detailing any threats, harm, or harassment against ICE employees.

However, "because ICE has 'asserted a *potential* substantial privacy interest,' it should be permitted to 'provide additional information in the form of supplemental declarations or affidavits'" regarding the "privacy interests in withholding these names." *Lawyers' Comm. for Civ. Rts. Under L.,* 2020 WL 7319365, at \*34 (quoting *White Coat Waste Project*, 404 F. Supp. 3d at 107); *see also Stein*, 454 F. Supp. 3d at 20 ("As it stands, the court does not have enough information to fully determine the privacy interests in [the withheld material] and weigh them against the public interest in disclosure. Accordingly, the court will . . . direct the agency to submit a supplemental *Vaughn* index and/or declaration to address the current deficiencies."). As with ICE's withholdings under Exemption 5, here too, the Court will order ICE to provide the requisite information in a *Vaughn* index.

### iii. Names of Third Parties

Plaintiffs separately challenge ICE's Exemption 6 withholding of the names of "third parties," such as professors, contractors, and other non-ICE individuals, arguing that ICE's categorical withholding fails to reflect varying privacy interests among those third parties. Pls.' Mot. at 24. For example, Plaintiffs argue that "[c]ivilians named in records regarding investigations of crimes have higher privacy interests than employees of detention centers under contract to ICE—and the public's interest in the latter's identities is far higher," but ICE's filings fail to take these variances into account. Pls.' Mot. at 24.

32

The Court agrees with Plaintiffs that ICE has failed to distinguish at all between the varying privacy interests among third parties, which problematizes its assertion of Exemption 6's protection. This is most glaringly reflected by ICE redacting presenters' names from slides that accompanied an LGBT awareness seminar, even when the presenter lists this presentation on their public curriculum vitae. Pls.' Mot. at 24. So, as with ICE's redactions of employee names under Exemption 6, the same result will hold: because ICE has "asserted a *potential* substantial privacy interest," it is permitted to "provide additional information in the form of supplemental declarations or affidavits" as to the named person's privacy interests in having their names withheld. *Lawyers' Comm. for Civ. Rts. Under L.*, 2020 WL 7319365, at *34.[7] ICE must address these deficiencies in its upcoming *Vaughn* index, or otherwise provide the responsive documents with the names unredacted.

### 4. Exemption 7(E)

Exemption 7(E) protects information from disclosure that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). ICE applied Exemption (7)(E) "to protect from disclosure law enforcement sensitive [URLs], dial in and access codes, domain names, and screen shots of various law enforcement sensitive databases and case management systems."

---

[7] The Court anticipates that, if ICE adequately supports its substantive withholdings under the other Exemptions as ordered, then ICE will have a more convincing justification for redacting the names of ICE employees and third parties under Exemption 6. As it stands now, ICE's justifications for Exemption 5 and 7 are deficient. Plaintiffs currently express a public interest in the names of ICE employees and third parties because "ICE's redactions of names prevent any independent evaluation of whether its redactions under the deliberative process privilege are proper," and because "the public has a strong interest in learning who develops and presents training to ICE employees." Pls.' Mot. at 23–25. However, it follows that if ICE had originally adequately supported its other withholdings, then Plaintiffs would have a less convincing need for the names of employees and third parties— Plaintiffs would have a better sense of "what their government is up to," the core consideration in the Exemption 6 balancing test. *Reps. Comm. for Freedom of the Press*, 489 U.S. at 773.

Pineiro Decl. ¶ 47.  ICE also applied Exemption 7(E) to withhold information that would "disclose techniques and/or procedures regarding the Enforcement and Removal Operation enforcement activities," such as "information on how various ICE and other law enforcement agencies communicate with each other," "internal passcodes," "screenshots demonstrating the navigation of a law enforcement system," "tips and tradecraft," and more.  *Id.* ¶ 48.

The Court observes that, in several other cases where ICE was withholding information from its databases, the threshold showing for 7(E) was deemed met because of the inherent law-enforcement use of these systems: ICE uses databases to "assist . . . with deporting people who are unlawfully in the United States, to arrest those who violate federal immigration laws, and to track investigations and court proceedings of those apprehended."  *Long v. ICE*, 149 F. Supp. 3d 39, 49 (D.D.C. 2015); *see also Isiwele v. U.S. Dep't of Health and Human Servs.*, 85 F. Supp. 3d 337, 360 (D.D.C. 2015) ("ICE properly redacted . . . database codes, case numbers, and numeric references . . . under FOIA 7(E).") (internal quotations omitted)); *Gosen v. U.S. Citizenship and Immigration Servs.*, 75 F. Supp. 3d 279, 290 (D.D.C. 2014) (database information such as codes and descriptions of documents "is precisely the type[ ] of information contemplated by the exemption").  But here, there is not enough information in ICE's declaration to reach that same outcome.  ICE uses Exemption 7(E) to withhold a broad swath of information in all kinds of forms, without any context for those materials.  Pineiro Decl. ¶ 48 (withholding material "[i]n an email discussing law enforcement data systems," "in emails and patient summaries," "in emails," and "in PowerPoint slides.").  It's not clear to the Court that these records were compiled for "law enforcement purposes," as is required for Exemption 7 to apply at all.  As with ICE's attempts to employ Exemption 7(C), the Court "will not examine each of the withheld documents to 'attempt to discern for itself whether the documents satisfy Exemption 7's threshold requirement.'"  *Nat'l*

*Press Club Journalism Inst.*, 2023 WL 9001337, at *16 (citing *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 57). In its upcoming *Vaughn* index, ICE must properly explain why these documents meet the law enforcement purposes threshold to the extent ICE wants to continue asserting Exemption 7(E) redactions.

### C. Segregability

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such a record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Here, ICE's declaration states: "[f]or each document, a page-by-page and line-by-line careful review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied." Pineiro Decl. ¶ 52.

"It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117 (citing *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007)). Yet, "agencies must still demonstrate with 'reasonable specificity' the bases for their conclusions regarding segregability." *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 81 (D.D.C. 2020). "[A] blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability." *Wilderness Soc'y*, 344 F. Supp. 2d at 19. Instead, "[a]n agency 'must usually submit a sufficiently detailed *Vaughn* Index for each document and an affidavit or declaration stating that it has released all segregable material' to meet this burden. A conclusory affidavit or declaration is insufficient." *Khatchadourian*, 453 F. Supp. 3d at 82 (citations omitted). A plaintiff may overcome the presumption that the agency has disclosed segregable material with "some 'quantum of evidence.'"

35

*Henderson v. Off. of the Director of Nat'l Intel.*, 151 F. Supp. 3d 170, 179 (D.D.C. 2016) (quoting *Sussman*, 494 F.3d at 1117).

Plaintiffs argue that ICE has failed to show that it released all non-exempt information that reasonably could be separated from information that was legitimately withheld.  Pls.' Mot. at 18. Given the outstanding issues that ICE must address in its upcoming *Vaughn* index, the Court will defer a finding on segregability until ICE addresses those issues—i.e., the adequacy of the search and the proprietary of ICE's withholdings under claimed Exemptions.  *Cf. Bayala v. Dep't of Homeland Sec.*, 246 F. Supp. 3d 16, 27 (D.D.C. 2017) (stating that it would be "premature" to determine whether the withheld documents contained segregable portions before determining if the agency's withholdings were proper); *Prop. of the People, Inc. v. Dep't of Just.*, 2021 WL 3052033, at *3 (D.D.C. July 20, 2021) (rejecting the agency's categorical approach to withholding and ordering the agency to "revisit its decisions on segregability").

### D.  Production of the Video File

At the time of the parties' July 8, 2024 status report, the only responsive record yet to be produced was a training video from 2016, approximately 26 minutes, 38 seconds long.  Joint Status Report, ECF No. 35.  On July 23, 2024, this Court ordered ICE to provide the video by August 12. Order, ECF No. 38.  ICE produced the video, with the name of the presenter "bleeped" out, on July 24.  Notice of Compliance, ECF No. 39.  The video consists of a slideshow and narration of a presentation entitled "Providing treatment to adult transgender patients in ICE custody: update on IHSC clinical guidelines," dated 2016.  Pls.' Video Mot. at 2.  ICE redacted the narrator's name from the video pursuant to Exemptions 6 and 7(C).  *Id.*  Before reaching the merits of this withholding, the Court will first address a lingering disagreement between the parties regarding the video's briefing schedule.

### 1. Briefing schedule

As of July 23, 2024, ICE had produced all responsive records save for the video file. The Court ordered ICE to produce the video file by August 12 and, also by August 12, to file its summary judgment motion "except as to the video file." July 23 Order, ECF No. 38. The Court also ordered ICE to file a summary judgment motion as to the video file one week after its production, by August 19. *Id.*

ICE produced the video file on July 24, several weeks before the court-imposed August 12 deadline. Notice of Compliance, ECF No. 39. On August 12, ICE filed its summary judgment motion—but in the Pineiro declaration, when describing the use of Exemption 6 and 7(C) for other responsive records, ICE grouped in the video file, rather than briefing it separately. Pineiro Decl. ¶ 39. ICE did not originally file a summary judgment motion as to *just* the video file, as the Court had ordered.

On August 26, 2024, Plaintiffs filed a motion for summary judgment regarding the video file, noting that this Court had ordered ICE to file such a motion, but "ICE ha[d] not done so." Pls.' Video Mot. at 3. However, ICE resents this characterization: "ICE noted in its combined brief that its opening brief . . . included the video file . . . and that the video only had Exemptions 6 and 7(C) withholdings—i.e., the name of a third-party individual." ICE Video Mot. at 1. ICE also states that it conferred with Plaintiffs' counsel regarding the fact that ICE would be briefing the video file along with the other responsive documents. *Id.* Expressing great frustration with Plaintiffs' video motion, ICE states that "Plaintiffs could have argued about the video file in their initial cross-motion for summary judgment because they had all of the information required to do so." ICE Video Mot. at 3.

This confusion could have been avoided had ICE simply informed Plaintiffs and the Court that, upon its unexpectedly prompt production of the video file, it would be deviating from the Court's scheduling order and briefing the video redactions along with all other Exemption 6 and 7(C) redactions.  Plaintiffs accurately represent the procedural history of this case: ICE was instructed to brief the video separately from other responsive documents, based on ICE's own representations that it would not be producing the video until late August.  Pls.' Video Reply at 1. When ICE produced the redacted video the day after this Court's July 23 Order, ICE could have announced its intent to brief the video alongside all other records.  It certainly was not clear based on the face of ICE's summary judgment motion or the Pineiro declaration that ICE was fully briefing the video redaction—ICE hardly mentions the video in these filings, and it was reasonable for Plaintiffs to assume that ICE would be following this Court's scheduling order to comprehensively brief the video's redaction in a separate document.

Having settled this easily avoidable confusion—which ultimately has no bearing on the merits of the dispute—the Court will address the summary judgment motions before it.

## 2.  Exemption 6 and 7(C)

At the outset, the Court concludes that Exemption 7(C) does not apply to the video because it was not created for law enforcement purposes.  The video is a training presentation to ICE medical staff regarding transgender detainees' medical needs; "[i]t was not created as part of any investigation of any kind of misconduct, nor does it disclose any guidelines, techniques, sources or procedures for law enforcement investigations or prosecutions."  Pls.' Video Mot. at 5.  ICE does not even appear to dispute this—it simply reincorporates its arguments from its original summary judgment brief, which the Court has already concluded are insufficient to meet Exemption 7's threshold.  ICE Video Mot. at 3.  Indeed, the fact that ICE lumped this medical

training video in with the rest of its Exemption 7 withholdings only bolsters this Court's broader conclusion for all records addressed *supra*—that ICE must submit a *Vaughn* index to give the Court a clearer picture of whether each withheld record actually satisfies the "law enforcement purposes" threshold of Exemption 7. Therefore, the Court will only analyze whether ICE has properly asserted Exemption 6 to withhold the video narrator's name.

Applying the Exemption 6 standard, explained *supra*, the Court must balance "the privacy interest in non-disclosure against the public interest" in releasing the video narrator's name. *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Hum. Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009). Under that balancing test, the Court concludes that ICE insufficiently supported its decision to withhold the name of the narrator. On one end of the scale, ICE has failed to lay the foundation for asserting a compelling privacy interest based on fear of harassment. As explained in the Exemption 6 discussion *supra*, "[t]he fact that federal employees have an identifiable privacy interest in avoiding disclosures of information that could lead to annoyance or harassment . . . does not authorize a 'blanket exemption' for the names of all government employees in all records." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 116 (D.D.C. 2005) (citing *Baez v. Dep't of Justice*, 647 F.2d 1328, 1338 (D.C. Cir. 1980)). "[T]o justify the redactions of the names of employees because of feared harassment, there must be some competent evidence that disclosure of that information could lead to harassment." *Lawyers' Comm. for Civ. Rts. Under L.*, 2020 WL 7319365, at *33. And on the other end of the scale, contrary to ICE's representations, Plaintiffs *have* identified a public interest in the narrator's name. The narrator's identity would reveal their relationship to ICE, their medical training and status as a licensed health care provider, and potentially their experience with transgender health issues—all of which would provide context for the public to understand ICE's approach to health

care for transgender detainees.  Pls.' Video Mot. at 5–6; Pls.' Video Reply at 3.  This context sheds

light on "what [the] government is up to."  *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 768 (D.C. Cir. 1990)

(quoting *Reps. Comm. For Freedom of Press*, 489 U.S. 749 at 773).

      The same result will hold here as with ICE's other Exemption 6 redactions of names:

"[B]ecause ICE has 'asserted a *potential* substantial privacy interest,' it should be permitted to

'provide additional information in the form of supplemental declarations or affidavits'" regarding

"privacy interests in withholding th[is] name[]."  *Lawyers' Comm. for Civ. Rts. Under L.*, 2020

WL 7319365 at *34.

      In sum, the Court finds that ICE's declaration is largely insufficient to justify its wide-

ranging withholdings.  The Court therefore will order the submission of a *Vaughn* index.  "While

there is no set form for a *Vaughn* index, the D.C. Circuit has noted three important elements for an

adequate *Vaughn* index: (1) the index should be one document that is complete in itself, (2) the

index must adequately describe the withheld documents or deletions, (3) the index must state the

particular FOIA exemption, and explain why the exemption applies," for each withheld or redacted

document.  *Schoenman v. F.B.I.*, 604 F. Supp. 2d 174, 196 (D.D.C. 2009) (citing *Founding Church

of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979)).  The *Vaughn* index will help to "restore

the normal adversarial balance by 'forc[ing] the government to analyze carefully any material

withheld,' thereby enabling 'the trial court to fulfill its duty of ruling on the applicability of the

exemption.'" *Id.* (quoting *Keys v. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987) (internal

quotation marks and citation omitted)).

## IV.    CONCLUSION

      Based on the foregoing, the Court **GRANT IN PART** and **DENY IN PART** ICE's Motion

for Summary Judgment and will **GRANT IN PART** and **DENY IN PART** Plaintiffs' Motion for

Summary Judgment, for all materials except the video file.  As to ICE's redaction in the video file,

the Court will **GRANT IN PART** and **DENY IN PART** Plaintiffs' Motion for Summary Judgment Regarding Video File and will **DENY** without prejudice ICE's Motion for Summary Judgment Regarding Video File.

For adequacy of the searches performed, ICE's motion will be granted in part and denied without prejudice in part; Plaintiff's motion will be denied without prejudice to allow ICE to remedy the insufficiencies in its searches. As for ICE's withholdings under Exemptions 5, 7(C), and 7(E) for all records except the video file, both parties' motions will be denied without prejudice to allow ICE to remedy the insufficiencies in its justifications or otherwise release the documents. Regarding ICE's redaction of email domain names under Exemption 6, Plaintiffs' motion will be granted, and ICE's motion will be denied; for all other Exemption 6 withholdings except as to the video file, both parties' motions will be denied without prejudice to allow ICE to remedy the insufficiencies in its justifications or otherwise release the documents.

As for the video, the Court will grant Plaintiffs' motion regarding the inapplicability of Exemption 7. Regarding Exemption 6, the Court will deny both parties' motions without prejudice, and the Court will allow ICE to remedy its insufficient justification for redaction or else release the name of the video narrator.

An Order consistent with this Memorandum Opinion will follow.

Date: ___2/25/___, 2025

Hon. Royce C. Lamberth
United States District Judge